11 A.3d 924

Joyce A. SCHMIDT, Administratrix of the Estate of Erin D. Schmidt, Deceased; Joyce A. Schmidt, in her own right, and Lindsay Schmidt, a Minor, by her Mother and Natural Guardian, Joyce A. Schmidt,

v.

BOARDMAN COMPANY, a Division of TBC Fabrication, Inc.; Boardman, Inc.; TBC Fabrication, Inc.; Coraopolis Volunteer Fire Department; Sinor Manufacturing, Inc., n/k/a Freightliner Specialty Vehicles, Inc., and Freightliner Specialty Vehicles, Inc. and Peter Jeffress and Michele Jeffress, individually and on behalf of their Minor Daughters Joeylynne Jeffress and Lauren Jeffress

v.

Coraopolis Volunteer Fire Department; Boardman Company, a Division of TBC Fabrication, Inc.; Boardman Inc.; Sinor Manufacturing, Inc.; and Freightliner Specialty Vehicles, Inc.

Appeal of Sinor Manufacturing, Inc., n/k/a Freightliner Specialty Vehicles, Inc., and Freightliner Specialty Vehicles, Inc.

Supreme Court of Pennsylvania.

Argued Sept. 15, 2009.

Decided Jan. 24, 2011.

Kim M. Watterson, Reed Smith LLP, Pittsburgh, for Sinor Manufacturing, et al.

James Michael Beck, Dechert LLP, Philadelphia, for Appellant Amicus Curiae, Product Liability Advisory Council, Inc.

Anthony John Rash, Dickie, McCamey & Chilcote, P.C., Pittsburgh, for Boardman, Inc.

Vicki Linn Beatty, Pittsburgh, Law Offices of Joseph M. Ghabour, P.C., for Coraopolis Volunteer Fire Department.

John P. Gismondi, Gismondi & Associates, P.C., Pittsburgh, for Peter Jeffress, et al.

Alan H. Perer, Swensen, Perer & Kontos, Pittsburgh, for Joyce A. Schmidt.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

*Mr. Justice Saylor files an Opinion, expressing the rationale for affirming the order of the Superior Court with respect to the "product-line exception issues" presented in the appeal, in which the Court is unanimous as to Parts I and II.A, and in which Mr. Chief Justice Castille and Messrs. Justice Eakin, Baer, and McCaffery join as to Part II.B. Part III of the Opinion, in which Mr. Chief Justice Castille and Mr. Justice Eakin join, sets forth a rationale in support of reversing the order of the Superior Court concerning the "physical injury issue" presented in the appeal.*

*Mr. Justice Baer files an opinion joining in the rationale for affirming the order of the Superior Court with respect to*

*the "product-line exception issues," and setting forth a rationale for vacating and remanding with respect to the "physical injury issue." Mr. Justice McCaffery joins this opinion and Madame Justice Todd joins this opinion in part.*

*Madame Justice Todd files an opinion joining part of the rationale for affirming the order of the Superior Court with respect to the "product-line exception issues," and joining in the rationale stated by Mr. Justice Baer for vacating and remanding with respect to the "physical injury issue."*

## OPINION AND OPINION IN SUPPORT OF REVERSAL

Justice SAYLOR.[1]

This civil litigation arises out of an accidental, in-transit deployment of a fire-engine hose, which caused the death of one child, severe injuries to another, and emotional distress on the part of family-member witnesses.

Appeal was allowed to consider: 1) whether this Court should adopt the product-line exception to the general rule of successor non-liability in strict products liability actions, and, if so, on what terms; and 2) whether, in strict liability proceedings, a plaintiff must prove a physical injury as a threshold to recovery. For the reasons that follow, we affirm the Superior Court's order as to the first issue, albeit on different grounds. With respect to the second question, the Superior Court's order will be affirmed by operation of law, since the Court is equally divided on that point.

### I. Factual and Procedural Background

In 1994, the Coraopolis Volunteer Fire Department ("CVFD") invited bids for the manufacture of a large-scale fire engine, or pumper, per CVFD-selected specifications. These included three cross-lay compartments spanning the width of the truck, designed to house and carry fire hoses pre-connected to an on-board water supply. The successful bidder was the Boardman Company, a division of TBC Fabrication, Inc. ("Boardman"), which manufactured and delivered the fire

1. This matter was reassigned to this author.

engine. CVFD separately acquired the necessary hoses, and the pumper was commissioned for use throughout the next decade.

In 1995, soon after CVFD acquired the Boardman fire engine, TBC liquidated based on the assertion that it was insolvent. Management of Sinor Manufacturing, Inc. ("Sinor") was interested in manufacturing and marketing ambulances and rescue vehicles, and apparently it was believed that name recognition associated with Boardman's fire-engine business would facilitate such an enterprise. Thus, Sinor purchased the Boardman name from TBC for use in relation with emergency vehicles. The purchase included engineering drawings for Boardman fire engines; additionally, Sinor bought certain inventory and equipment from TBC at an auction. Other facilities and assets of TBC—including manufacturing and sale facilities which were used in producing fire engines; assets and facilities associated with TBC's other principal line of business in custom steel fabrication; and the Boardman name relative to this latter line of products—were acquired by Boardman, Inc. ("BI"). Apparently BI was a sister company to TBC.[2] Finally, TBC sold proprietary rights associated with telescoping aerial platforms used in fire suppression to Aerial Innovations, Inc., an unrelated company.

In 1998, Sinor's ownership interests were restructured, with a majority interest being acquired by Freightliner LLC, and Sinor was combined with a Freightliner division and renamed Freightliner Specialty Vehicles, Inc. ("Appellant").

In 2004—ten years after CVFD's purchase of the Boardman fire engine and nine years after its manufacturer's liquidation—CVFD dispatched its Boardman pumper in response to an emergency call. While en route, unbeknownst to the operators, a 200–foot, pre-connected fire hose fell from one of the cross-lay compartments, unraveled, and lodged under the

2. For reasons developed in further detail below, the trial record concerning BI's relationship with TBC and Boardman is undeveloped. Based on documents accompanying various docketed submissions, Appellant asserts that TBC was a subsidiary of Wichita Steel Fabrication, Inc., which, upon TBC's insolvency, formed BI to continue in the steel-fabrication business.

tire of a parked car. After it broke free with accumulated force, the hose or nozzle struck two ten-year-old bystanders, Erin Schmidt and Joeylynne Jeffress, causing severe injuries to both. Erin died the next day. The accident was witnessed by: Erin's mother, Joyce Schmidt; [3] Erin's sister, Lindsay Schmidt; and Joeylynne's sister, Lauren Jeffress.

Subsequently, Appellees, the Schmidt and Jeffress families, commenced civil actions in the court of common pleas, naming as defendants: CVFD; TBC and its Boardman division; BI; and Appellant (denominated in the complaint both as Sinor and Freightliner Specialty Vehicles, Inc.). Redress was sought for the wrongful death of Erin Schmidt, the injuries sustained by Joeylynne Jeffress, and the emotional distress suffered by Joyce and Lindsay Schmidt and Lauren Jeffress. Despite the prevailing general rule of law that the purchaser in an asset sale does not acquire the seller's tort liabilities, Appellees asserted that BI was liable as a mere continuation of TBC. Appellees grounded their claims against Appellant on the theory that it perpetuated the relevant Boardman product line, thus triggering the "product-line exception" to the rule against successor liability, as reflected in prevailing Superior Court precedent. *See, e.g., Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981) (adopting the product-line exception); *Hill v. Trailmobile, Inc.,* 412 Pa.Super. 320, 603 A.2d 602 (1992) (elaborating on the exception). Although the complaint asserted claims sounding in both negligence and strict liability against Appellant, Appellees subsequently opted to proceed solely in strict liability.

At the pretrial stage, the Schmidt and Jeffress actions were consolidated. Appellant unsuccessfully sought to preclude plaintiffs Joyce and Lindsay Schmidt and Lauren Jeffress from pursuing recovery for emotional distress damages on the ground that such damages are not recoverable in a strict products liability action. CVFD settled with Appellees, ten-

3. The parties disagree as to whether or not Joyce Schmidt was physically impacted by the fire hose. As further discussed below, resolution of this dispute is beyond the scope of the legal issues accepted by this Court for review.

dering the maximum damages recoverable under the law consistent with governmental immunity. Nevertheless, trial proceeded against CVFD on Appellant's cross-claim for indemnity and contribution. Appellees also discontinued their claims against TBC.

Just before trial, Appellees settled with BI and withdrew their opposition to BI's summary judgment motion, which the trial court granted. Further, on Appellees' motion, Appellant was precluded at trial from adducing evidence concerning BI's retention of TBC management personnel and acquisition of various of its assets, facilities, and business operations in the 1995 liquidation.

At trial, the jury was tasked with resolving three principal liability issues: 1) was there a product defect in the Boardman fire truck; 2) could Appellant be held liable under the product-line exception to the general rule of successor non-liability; and 3) was CVFD negligent. Appellees asserted that the Boardman fire engine was defective, because it lacked a retaining device to secure fire hoses in the cross-lay compartments. Expert testimony was offered in support of this proposition. To advance the product-line exception, Appellees adopted the theme that, under Pennsylvania law, "you take the good with the bad." N.T., Sept. 5, 2006, at 110; *see also id.* at 112–13, 129, 132, 138. In this regard, they relied substantially on Sinor's sales advertising, which misleadingly portrayed Sinor as a continuation of Boardman, for example, as by possessing the latter's 65 years' experience in the manufacture of emergency vehicles. Further, Appellees highlighted that Sinor claimed in its product literature to make fire suppression vehicles and, in fact, had manufactured "woods trucks" with fire suppression capability. Appellees also offered proof that Sinor acquired the engineering drawings for full-scale fire trucks from TBC in connection with its limited purchase of the Boardman name, and of its auction purchase of some of TBC's material assets. To support the emotional-distress claims, Appellees adduced substantial evidence of the mental anguish and post-traumatic stress suffered by Joyce and Lindsay Schmidt and Lauren Jeffress.

Appellant, for its part, adduced expert testimony to the effect that a hose retaining device was unnecessary and would interfere with the fire engine's utility by impeding ready access. In disputing the applicability of the product-line exception to the rule against successor liability, Appellant's counsel read to the jury admissions from Appellees that:

Neither [Freightliner Specialty Vehicles, Inc.] nor [Sinor] had any role in the design, manufacture, assembly, distribution or sale of the subject fire truck[.]

... [Sinor] did not purchase any work in progress of TBC.... [Sinor] did not purchase, own, lease, operate, use, or take possession of any TBC plant or facility[.]

N.T., Sept. 12, 2006, at 1082. Appellant also developed that it had ceased production of emergency vehicles in 2001 to concentrate on a niche market in specialized recreational trucks.

Additionally, Appellant stressed the substantial differences between pumper fire engines and the smaller rescue vehicles that Sinor had manufactured, which did not serve a fire suppression function. In response to the contention that the woods trucks were in the same product line as Boardman fire engines, Appellant demonstrated that the two trucks Sinor manufactured were based on a Ford pickup truck platform, equipped with a removable skid unit equipped with a bladder designed to hold a modest amount of water. Appellant did not deny the emotional distress suffered by family-member witnesses to the accident but sought to mitigate the damages. Further, Appellant set out its case of negligence against CVFD, asserting that the accident could not have happened had the hoses been packed into the cross-lay compartment properly.

At the trial's close, the court charged the jurors that a product manufacturer is a guarantor of product safety and was responsible for "all harm" caused by a product defect, including injury to "a user, consumer, or bystander." N.T., Sept. 14, 2006, at 1255–56.

Further, in its instructions, the trial court couched the product-line exception to the rule against successor liability as follows:

Where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by the defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

Several other factors also used in determining whether a successor corporation has undertaken the same product line include:

One, whether the corporation advertised itself as an ongoing enterprise; two, whether the corporation acquired the predecessor's [sic] corporation's goodwill; three, whether the corporation maintained the same name, clients, and product; four, whether the corporation deliberately exploited the original manufacturer's established reputation; five, the virtual destruction of plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business; and, six, the successor's ability to assume the original manufacturer's risk-spreading role and the fairness of requiring the successor to assume responsibility for defective products that were a burden attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business.

N.T., Sept. 14, 2006, at 1259–60. Additionally, the court, as follows, authorized the jurors to find that Appellant was TBC's successor by its own admission:

Plaintiffs further contend that the defendant has made an admission that they are the successor company. Under Pennsylvania rules of evidence, an out-of-court statement by a party to a lawsuit may be a [sic] used against the party at trial. The plaintiffs contend that the defendant admitted they were the same company as the original manufacturer, and the successor to the original manufacturer when they

produced advertisements and marketing material that told the public that they were the same company.

*Id.* at 1260–61.

On the emotional distress claims, the trial court instructed the jurors along the following lines, as exemplified by the charge pertaining to Joyce Schmidt:

According to Pennsylvania law, a plaintiff may recover for infliction of emotional distress due to the traumatic impact of viewing a close relative suffer injury as the result of tortuous [sic] conduct. The tortfeaser [sic] inflicts upon this bystander an injury separate and apart from the injury to the victim. It is your duty to consider the mental pain, anguish, suffering, and distress, if any, which Joyce Schmidt has endured since the injury to her daughter and which she may endure in the future.

*Id.* at 1266–67.

The jury returned a verdict in favor of Appellees, finding Appellant and the CVFD each fifty percent liable for the wrongful death of Erin Schmidt, the injuries sustained by Joeylynne Jeffress, and the emotional distress endured by Joyce Schmidt, Lindsay Schmidt, and Lauren Jeffress. Appellant sought post-trial relief, arguing, among other things, that: they were entitled to judgment notwithstanding the verdict ("JNOV"), as Appellees did not establish the threshold requirements to invoke the product-line exception; the trial court erred in charging the jury on the product-line exception; and the trial court erred by refusing to mold the verdict to exclude emotional distress damages awarded to family-member witnesses. The trial court denied relief, and Appellant appealed to the Superior Court.

In its opinion under Rule of Appellate Procedure 1925, the trial court initially indicated that Appellant's statement of matters complained of on appeal was prolix; thus, it believed it was authorized to apply a rebuttable presumption that none of the issues had merit. *See Schmidt v. Coraopolis Volunteer Fire Dep't,* No. GD 05–007191, *slip op.* at 10 (C.P. Allegheny, July 25, 2007) (citing *Kanter v. Epstein,* 866 A.2d 394, 401 n. 7

(Pa.Super.2004) (quoting *United States v. Hart,* 693 F.2d 286, 287 n. 1 (3d Cir.1982)); *Estate of Lakatosh,* 441 Pa.Super. 133, 136 n. 1, 656 A.2d 1378, 1380 n. 1 (1995) (same)).[4]

As to the product-line exception, the court developed that the Superior Court's *Dawejko* decision recognized both a general rule of successor non-liability and a series of uncontroversial exceptions, including express assumption of liabilities; merger or consolidation; "mere continuation" of the selling corporation; and fraudulent transactions. *See Dawejko,* 290 Pa.Super. at 18, 434 A.2d at 107. Further, the court explained, *Dawejko* adopted another exception—product-line—based on the following principle derived from the New Jersey Supreme Court's opinion in *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981):

> Where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko,* 290 Pa.Super. at 23, 434 A.2d at 110 (quoting *Ramirez,* 431 A.2d at 825).

Additionally, the trial court recognized that *Dawejko* took note of various sets of relevant factors developed in the courts of other jurisdictions, the following ones articulated by the California Supreme Court in *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977):

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fair-

4. Parenthetically, the decision in *Eiser v. Brown & Williamson Tobacco Corp.,* 595 Pa. 366, 938 A.2d 417 (2007) (opinion announcing the judgment of the Court), provides some context concerning the trial court's approach in this regard, albeit further commentary is beyond the scope of the present appeal.

ness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Ray*, 136 Cal.Rptr. 574, 560 P.2d at 9. The court noted, however, that the *Dawejko* court declined to make any such additional factors mandatory, explaining, instead:

it is better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation. The various factors identified in the several cases discussed above will always be pertinent.... The exception will more likely realize its reason for being, however, if such details are not made part of its formulation. The formulation of the court in *Ramirez v. Amsted Industries, Inc., supra*, is well-put, and we adopt it.

*Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111.

Based on the above, the trial court indicated that it attempted, in its instructions, to follow *Dawejko* literally. Nevertheless, the court recognized that, in its decision in *Hill*, the Superior Court appeared, at least at one passage, to have rendered the *Ray* factors mandatory. *See Hill*, 412 Pa.Super. at 328, 603 A.2d at 606 (indicating that *Dawejko* held that "the product-line exception ... may *only* be applied when the [*Ray* factors] have *each* been established" (emphasis in original)).[5] Even so, in accordance with its decision to adhere to *Dawejko*, the trial court indicated that it considered the *Ray* factors advisory only. *See Schmidt*, No. GD 05–007191, *slip op.* at 15, 21.

Paradoxically, the trial court proceeded to examine the *Ray* factors—and only those factors—as applied to the present case. In doing so, it found the first requirement met, because there was a virtual destruction of Appellees' remedies against

5. As further discussed below, *Hill's* perspective, in this regard, clearly reflects a misreading of *Dawejko*.

Boardman, since TBC had long ago liquidated. *See id.* at 16.[6]
As to the Appellant's ability to assume the original manufac-
turer's risk-spreading role, the court reasoned:

> [Sinor] remained an ongoing manufacturer of emergency
> vehicles, and as such, continued to make profits and carry
> liability insurance. This Court found Sinor to be in a position
> to distribute any potential liability among the public as a
> cost of doing business.

*Id.* at 16–17.[7] Regarding the factor centered on overall fair-
ness, the trial court emphasized Appellant's advertising mis-
representations and the value it garnered from its tactic. The
court concluded with the following comments centered on loss
spreading:

> What cannot be ignored in this analysis is the Superior
> Court's "attempt to implement the 'social policies underlying
> strict product liability' when adopting the product-line ex-
> ception." That being, to offer an injured and innocent
> plaintiff an avenue of redress. The present case finds a
> child killed in an unthinkable accident in the presence of her
> family, another child severely injured and disfigured and a
> manufacturer no longer operating in its original configura-
> tion, which if it did so would permit Plaintiffs to proceed
> against a Defendant with assets and/or liability insurance.
>
> These circumstances are on-point with the precepts of strict
> product liability. These circumstances are also on-point
> with the precepts of the product-line exception to the suc-
> cessor liability rule. These circumstances are also on-point
> with what the Superior Court contemplated when adopting
> the product-line exception.

6. The trial court's analysis in this regard did not track the phrasing of
 the pertinent factor as framed by the *Ray* court, in terms of the
 defendant's "caus[ing]" the destruction of the plaintiff's remedies.
 Rather, its focus was merely on the fact that such remedies were "long
 ago destroyed." *Schmidt,* No. GD 05–007191, *slip op.* at 16.

7. There was little or no evidence adduced at trial, however, concerning
 Appellant's profitability or the scope of its liability insurance, which
 Appellant contended did not cover liability relative to defects in fire
 engines manufactured by a different company.

Based on these facts, this Court determined that the *Ray* factors were present and the issue of successor liability could proceed to a jury.

*Schmidt,* No. GD 05–007191, *slip op.* at 18–19 (internal citation omitted).

In terms of its product-line instruction to the jury, the trial court characterized the charge as "a conglomeration of the law." *Id.* at 20. Further, it accepted Appellees' position that "the product-line exception [is] an equitable remedy and that [the *Ray* ] factors need only be considered and a decision reached based on its fairness rather than the hard-line approach argued by opposing counsel." *Id.* at 21. The court also deemed claims of error regarding the treatment of the issue of successor liability to have been waived, as: Appellant adopted the position (in response to Appellees' assertion that the trial judge should decide the issue of successor liability) that there were disputed facts appropriate to jury disposition; and Appellant did not object to supplemental jury instructions, although the court asked whether there were objections or exceptions. *See id.* at 22.[8]

Concerning the appropriate roles of judge and jury in the decision-making on successor liability matters, the court also offered the following comments:

It is interesting to note that at the beginning of the trial it was defense counsel's position that the issue of "successor liability/product line exception" was for the Court to decide, not the jury. The Plaintiff argued for the jury to do so. The Court agreed with the Plaintiff and so ruled. After the jury was out and it sent a request to hear again the elements of successor liability, counsel for the respective parties changed positions. The Plaintiffs [sic] requested the Court to decide successor liability, but defense counsel wanted the issue to remain with the jury. This Court ruled

8. In the alternative, the court indicated that, if there was error in the instruction, it was harmless, since all six factors identified in the charge were consistent with the *Ray* factors. *See Schmidt,* No. GD 05–007191, *slip op.* at 22. This analysis, however, is unresponsive to Appellant's complaint that the trial court should have instructed the jury that it was mandatory for Appellant to establish each of the *Ray* factors.

for defense counsel's position and the matter remained with the jury. The Court was consistent in its rulings on the successor liability issue while counsels were not.

*Schmidt,* No. GD 05–007191. *slip op.* at 22–23.

In response to Appellant's challenge to the charge on infliction of emotional distress in a case litigated in strict liability, the trial court borrowed liberally from negligence theory. The court reasoned that, since *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979)—in which this Court abandoned the traditional rule requiring physical impact in favor of bystander recovery on claims of negligent infliction of emotional distress—the common thread of every decision recognizing such a claim was the relationship between the bystander and the victim, not the underlying tort. Although acknowledging that support for extension of the theory into the strict liability setting was modest, the trial court found persuasive the decisions in *Shepard v. The Superior Court of Alameda County,* 76 Cal. App.3d 16, 142 Cal.Rptr. 612 (1977), and *Walker v. Clark Equipment Co.,* 320 N.W.2d 561 (Iowa 1982), as each court had adopted the formulation of the bystander rule as set forth in *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), and approved emotional distress claims in strict liability cases. *See Schmidt,* No. GD 05–007191, *slip op.* at 25 & n. 30. The court stressed that it had observed the requirements that the plaintiff be located close to the accident, the distress result from the plaintiff's contemporaneous sensory observation of the accident, and the plaintiff and the victim be closely related. *Id.* at 24.

In the ensuing appeal, a divided Superior Court panel affirmed in a published decision. *See Schmidt v. Boardman Co.,* 958 A.2d 498 (Pa.Super.2008). The majority opened its legal analysis with a discussion of the confusion surrounding the application of the *Ray* factors in light of the tension between the discussions in *Dawejko* and *Hill.* However, the majority highlighted that, despite indicating that the *Ray* factors are mandatory, *Hill* also reaffirmed the overall flexibility of the product-line exception as embodied in *Dawejko.* Thus, the court pronounced, *"Hill* is compatible with *Dawejko*

and we are consequently bound to apply the decisional law of both cases." *Id.* at 506.

The majority proceeded to treat the *Ray* factors as mandatory and the *Ramirez* definition as merely advisory. *See id.* at 507.[9] It then reviewed the evidence presented at trial, concluding that there was sufficient evidence to establish two of the three *Ray* factors, and that Appellant failed to carry its burden (on appeal) of demonstrating that the evidence was insufficient as to the *Ray* risk-spreading factor. *See id.* at 508–12. Then, taking into account other factors including the *Ramirez* formulation of the product-line exception, the majority concluded that, "[o]n balance, the jury was provided with sufficient evidence from which it could find that 'it [was] just to impose liability on the successor corporation.'" *Id.* at 514 (quoting *Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111).

As concerns Appellant's complaint that the trial court failed to instruct the jurors that the *Ray* factors were mandatory in accordance with *Hill*, the Superior Court majority couched this as a "minor omission [that] did not amount to fundamental, prejudicial legal error." *Id.* at 515 It then appeared to retreat from its previous treatment of the *Ray* factors as binding, stating,

> We believe that the better interpretation of *Hill* is that a jury is entitled to balance the various factors of the product line test in accordance with *Dawejko*. If a jury does so and returns a general verdict finding a successor corporation liable, its verdict, at a minimum, must be based upon evidence sufficient to support the existence of the three *Ray* factors. In the absence of a special verdict sheet detailing

9. As further discussed below, such approach is not consistent with either *Dawejko* or *Hill*, since both applied the *Ramirez* formulation as the central, governing principle. *See Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111 ("The formulation of the court in *Ramirez v. Amsted Industries, Inc.* is well-put, and we adopt it." (citation omitted)); *Hill*, 412 Pa.Super. at 330, 603 A.2d at 607 ("[A]fter applying the *Ramirez* definition ..., we conclude that [a defendant] *is*, in fact, a product line successor[.]" (emphasis in original)).

Indeed, the approach of the Superior Court majority was inverse to that of *Dawejko*, in terms of the mandatory versus advisory treatment of *Ramirez* and *Ray*.

all of the factors of the product line exception, it is irrelevant whether the jury specifically found the existence of the three *Ray* factors, as long as the evidence was sufficient to establish these factors.

*Schmidt,* 958 A.2d at 515.

In a footnote, the majority observed that Appellant also challenged the instruction authorizing the jurors to take Appellant's advertising misrepresentations as an admission to successor status. However, it deemed such argument waived, in light of insufficient development. *See id.* at 516 n. 5.

Finally, the majority considered Appellant's evidentiary challenges, including to the exclusion of the evidence of BI's acquisition of TBC's custom steel fabrication business and other facilities. According to the majority, this evidence was not relevant, since

For purposes of the product line exception, only those assets that are directly related to the product line at issue are relevant for determining whether the successor purchased substantially all of the predecessor's assets; undertook essentially the same manufacturing operation as the predecessor; and whether the successor's purchase eliminated a plaintiff's remedy. Were we to hold otherwise, then our decision would elevate the form of corporate transactions over their substance, and would make it virtually impossible for a corporation with separate divisions/businesses to produce a successor corporation, if that corporation sold its assets to distinct corporate entities along the lines of its separate divisions/businesses. Given the public policy rational [sic] of the product line exception, we decline to fashion such a rule.

*Schmidt,* 958 A.2d at 517.

As to the emotional distress claims, the Superior Court majority found the trial court's reasoning persuasive and adopted it as its own. Further, the majority explained:

Our decision reinforces the tort of infliction of emotional distress as a distinct and separate cause of action in Pennsylvania. Under the *Sinn* standard, Plaintiffs presented

sufficient evidence to support a charge to the jury on infliction of emotional distress, and we discern no reason why the bystander Plaintiffs should be denied recovery on the ground that the Plaintiffs who suffered physical injury asserted a claim for products liability. As the *Shepard* court explained:

> By alleging the presence of the requirements listed in *Dillon*, petitioners have stated a sufficient cause of action. The injuries complained of are as much a foreseeable consequence of a defect in design and manufacture as of the negligence of the driver and the 'potentially infinite liability' upon manufacturers, which Ford fears, will not arise by reason of the restrictions imposed by the court in *Dillon* which would apply equally to negligence, strict liability and warranty cases.

*Shepard*, 142 Cal.Rptr. at 615.

*Schmidt*, 958 A.2d at 519–20. As such, the Superior Court majority determined that "a bystander plaintiff who witnesses injury to a close relative can recover emotional distress damages when the injured person's underlying cause of action is based on strict products liability rather than negligence." *Id.* at 519.

Responding to a dissenting position that physical harm was necessary to support a claim of damages for emotional distress, the majority indicated that courts generally have concluded that the definition of physical harm, for purposes of Section 402A of the Second Restatement of Torts, encompasses "injury that solely manifests itself in the form of emotional shock and disturbance." *Id.* at 520 n. 7 (citing *Walters v. Mintec/Int'l*, 758 F.2d 73, 77 (3d Cir.1985)).[10] Additionally, the majority took the position that infliction of emotional distress

10. *See* RESTATEMENT (SECOND) OF TORTS § 402A (1965) ("One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for *physical harm* thereby caused to the ultimate user or consumer[.]") (emphasis added); RESTATEMENT (SECOND) OF TORTS § 7 (1965) (defining "physical harm" throughout the Second Restatement as "the physical impairment of the human body, or of land or chattels.").

comprises an "independent cause of action." *Id.* The majority stated:

> In point of fact, the bystander Plaintiffs (*i.e.* Joyce Schmidt, Lindsay Schmidt and Lauren Jeffress) never pled a products liability claim against Appellant[ ]; rather, they stated a cause of action based solely on the tort of infliction of emotional distress.

*Schmidt,* 958 A.2d at 520 n. 7.

Judge, now Justice, Orie Melvin authored the concurring and dissenting opinion, which, as noted, differed with the majority's approach to emotional distress damages. *See id.* at 521 (Orie Melvin, J., concurring and dissenting). Recognizing that this issue was one of first impression, the dissent found that the plain language of Section 402A controlled, apparently reasoning that, because Appellees did not suffer any physical harm from the alleged defective product, they could not recover products liability damages. Moreover, the dissent determined that the trial court's reliance on negligence principles was in error. *See Bugosh v. Allen Refractories Co.,* 932 A.2d 901, 911 (Pa.Super.2007) ("[N]egligence concepts have no place in a case based on strict liability.") (citation and quotation marks omitted), *appeal dismissed as improvidently granted, Bugosh v. I.U. N. Am., Inc.,* 601 Pa. 277, 971 A.2d 1228 (2009) (*per curiam*). Therefore, the dissent concluded that the judgment should be vacated and the matter remanded to permit the trial court to mold the verdict.

Again, we allowed the appeal to address discrete questions concerning the product-line exception to the rule against successor liability and the compensability of emotional injuries in the strict-liability setting. *See Schmidt v. Boardman Co.,* 601 Pa. 381, 382, 973 A.2d 411, 412 (2009) (*per curiam*). As to the viability of the product-line exception, we also directed the parties to address whether the question was waived, since Appellant did not raise it in the trial court or the Superior Court. *See id.*

■ Our review of the legal issues accepted for review is plenary.

## II. Product Line

### A. Viability of the product-line exception

Appellant regards the product-line exception to the established rule of successor non-liability as inconsistent with the rationale underlying strict products liability, because it penalizes successor corporations which did not design, make, sell, or otherwise profit from a defective product, and which lacked any opportunity to make the product safe. *See Cafazzo v. Cent. Med. Health Servs., Inc.,* 542 Pa. 526, 531, 668 A.2d 521, 524 (1995) (explaining that "[t]he policy behind strict liability is 'to insure that the costs of injuries resulting from defective products are borne by *the manufacturers who put such products on the market*....' " (quoting *Shepard v. Alexian Bros. Hosp.,* 33 Cal.App.3d 606, 109 Cal.Rptr. 132, 134 (1973) (emphasis added))). Since a putative successor owes no duty to a plaintiff injured by another's product, and in the absence of any causal connection with the harm or fault, Appellant contends that the exception is premised solely on an unbridled cost-shifting rationale. The result, Appellant argues, is to convert strict liability into absolute liability, a scheme which this Court previously has eschewed. *See id.* at 535, 668 A.2d at 526 ("To assign liability for no reason other than the ability to pay damages is inconsistent with our jurisprudence.").

Appellant also discusses the social and economic consequences associated with the exception, maintaining that its application discourages the sale and productive use of corporate assets and threatens small businesses, particularly given the difficulty encountered by successors in obtaining insurance for products it did not manufacture or distribute. According to Appellant, given the broad range of competing policies implicated by the product-line exception, any expansion of tort law to encompass it should be the subject of legislative consideration. *See* Brief for Appellant at 30 ("The need for judicial restraint is particularly important where, as here, practical considerations and interests beyond those of the litigants are involved.").

In light of the above, Appellant couches this judicially-crafted exception as "expansive, unprincipled," and "almost universally rejected." Reply Brief for Appellant at 1–2. *See generally* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 12 cmt. b, at 210 (1998) (rejecting the product-line exception, consistent with the position of most courts, as "unfair and socially wasteful"). In terms of the present case, Appellant complains that:

Application of the [product-line] exception resulted in a seven-figure judgment against a company that had purchased only a fraction of the assets of an already insolvent manufacturing entity as one small part of that entity's overall liquidation plan; that did not take over and continue the manufacturer's operations and never produced the product at issue; and whose purchase of limited assets did not cause the destruction of plaintiff's remedy against the manufacture.

Brief for Appellant at 31.

Appellant's *amicus,* the Product Liability Advisory Council, Inc. ("PLAC"), provides a separate basis for this Court to reject adopting the product-line exception. PLAC alludes to intractable difficulties encountered in reconciling the pillars of strict-liability doctrine, as they have been articulated in Pennsylvania, with the manner in which the doctrine is actually administered. PLAC's brief reflects that such difficulties are amply noted in this Court's deeply divided opinion in *Phillips v. Cricket Lighters,* 576 Pa. 644, 841 A.2d 1000 (2003) (plurality), as well as the Third Circuit's recent decision in *Berrier v. Simplicity Manufacturing, Inc.,* 563 F.3d 38 (3d Cir.2009). PLAC emphasizes that, in light of those difficulties, the Court has identified a "prevailing consensus . . . that there would be no further expansions under existing strict liability doctrine." *DGS v. U.S. Mineral Prods. Co.,* 587 Pa. 236, 254 n. 10, 898 A.2d 590, 601 n. 10 (2006). PLAC regards the product-line exception as just such an impermissible expansion, contrary to the moratorium indicated in *DGS.*

Responding to Appellees' position that its global challenge to the product-line exception is waived since it was not raised

at trial or in the Superior Court,[11] Appellant takes the position that the issue preservation requirement contained in Rule of Appellate Procedure 302 does not apply to discretionary appeals accepted by this Court. Further, Appellant argues that the viability of the product-line exception squarely implicates the criteria for this Court's review under the note to Rule of Appellate Procedure 1114, which Appellant suggests trumps any technical failures which may have occurred previously. More centrally, Appellant advances a futility rationale, asserting that, in light of the prevailing Superior Court precedent, the trial court and the Superior Court would have been powerless to override it. Moreover, Appellant contends, requiring issue preservation in the face of futility would result in an unnecessary drain on court resources. In its reply brief, Appellant invokes *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966), for the proposition that "a finding that [a party] waived its challenge for failing to make a fruitless objection would not further the orderly administration of justice." *Cleveland v. Johns–Manville Corp.*, 547 Pa. 402, 412, 690 A.2d 1146, 1151 (1997) (citing *Kuchinic*).

Appellees, for their part, forcefully maintain that Appellant's frontal assault on the product-line exception is unpreserved, since it was not raised in post-trial motions, in the statement of matters complained of on appeal, or in the Superior Court. Appellees point to Rule of Appellate Procedure 302(a) as unequivocally establishing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). According to Appellees, experienced trial attorneys routinely make a record on issues they may wish to raise in the appellate courts, even where they know the objection will be unsuccessful at the trial stage.

11. In its post-trial relief motion and statement of matters complained of on appeal, Appellant raised a number of arguments as to why it was entitled to JNOV, namely: that Oklahoma law should have applied to the determination of successor liability, which does not recognize the product-line exception; and, in the alternative, that Appellees failed to establish the elements of the product-line exception as set forth in *Dawejko* and *Hill*. Appellant did not argue, however, that the product-line exception should not be applied in Pennsylvania.

On the merits, Appellees stress that Appellant's points about the absence of duty, causation, and fault apply with regard to all of the exceptions to successor non-liability (agreement, merger, consolidation, fraudulent-conveyance, product-line), most of which Appellant accepts. The same is true, Appellees assert, about the purported negative impact on business.[12] Furthermore, Appellees regard the product-line exception as consistent with a long-recognized tradition, in Pennsylvania, of protecting its citizens who are injured by defective products. In this regard, Appellees take issue with the notion that the cost-shifting rationale supporting liability without fault has been or should be disapproved. *See, e.g.,* Brief for Appellees at 22 ("[I]t is preposterous to say that Pennsylvania has abandoned 'cost shifting' as one of the core policies underlying strict liability, and hence, to the extent the product line exception reflects the same, it is to be praised, not criticized."). In response to Appellant's position that the matter is one best left to the Legislature, Appellees highlight the historically strong involvement of the common law in shaping product liability doctrine. *See, e.g., id.* at 24 ("None of the other exceptions to successor liability in Pennsylvania emanated from the state legislature; they all came from the courts in common law case decisions.").

Appellees also take issue with Appellant's characterization of the product-line exception as unprincipled. In this regard, they note that merely continuing a product line does not subject the putative successor to liability—to the contrary, several other circumstances must be present. Appellees explain:

The rationale for the product line exception is multi-faceted and may be summarized as follows. First, by continuing the product line, the successor profits from all the accumulated good will and reputation of its predecessor and, hence, it is only fair that they should respond for injuries caused

12. *See* Brief for Appellees at 23 ("One could say that *any* of the exceptions to successor liability might discourage corporate sales." (emphasis in original)); *id.* at 24 ("[I]t is pure nonsense for [Appellant] and the amicus to suggest that the product line exception presents some unique problem in procuring liability insurance.").

by prior sales. Second, the successor is in a position to assess the liability exposure and factor that into the purchase price of the predecessor's product line. Third, it encourages the predecessor and successor to focus on who will be responsible for injuries caused by previously sold products, thus reducing the chances that the plaintiffs will be left without any remedy at all. Fourth, it is the sale of the assets to the successor which causes the predecessor to dissolve and go out of business, thereby effectively eliminating any remedy the plaintiff may have against the original product maker. Fifth, the successor, consistent with the principles of strict liability, is in the best position to spread the cost of such liabilities by obtaining insurance and/or treating the added exposure as a cost of doing business.

Brief for Appellees at 15 (footnotes omitted). Additionally, Appellees stress the flexibility and equity infused into the doctrine by *Dawejko*.

Further, Appellees observe that, under prevailing Superior Court precedent, the product-line exception has been an established part of Pennsylvania law for over one-quarter of a century. They question the weight of the authorities from other jurisdictions advanced by Appellant, asserting that "this is not a numbers game," but "is about what the courts in Pennsylvania think is best for its [sic] citizens." *Id.* at 18. As to the position embodied in the Restatement Third, Appellees dismiss it as "widely criticized by legal scholars as representing an unbalanced view of the law advanced largely by insurance, business and manufacturing interests." *Id.* at 19.

In terms of the present case, Appellees contend that Appellant "directly profited from [its] blatant exploitation of Boardman's brand name recognition," particularly as it "quickly gained market share and profits that otherwise would have been unattainable for a new company." *Id.* at 20–21 & n. 19. They assert that it is in no way unjust for a corporation which holds itself out as another, and profits from such representations, to be burdened with the latter's liabilities.

### 1. The current state of Pennsylvania strict liability doctrine

At the outset, the various arguments, particularly those of PLAC, touch on prevailing difficulties with a reasoned application of Pennsylvania law in the strict products liability context, as exemplified by the divided opinion in *Phillips* and the Third Circuit's decision in *Berrier.* Notably, this author and Mr. Chief Justice Castille have advocated the resolution of the controversial foundational matters before addressing subsidiary ones. *See Berrier v. Simplicity Mfg., Inc.,* 598 Pa. 594, 595, 959 A.2d 900, 901 (2008) (Saylor, J., joined by Castille, C.J., concurring in a denial of certification).[13]

As amply developed elsewhere, the central difficulty afflicting the present scheme under *Azzarello v. Black Brothers Co., Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978), lies in maintaining a central premise that negligence concepts have no place in Pennsylvania's strict liability law, *see, e.g., Phillips,* 576 Pa. at 655, 841 A.2d at 1006 (lead opinion), when, functionally, the law of "strict" products liability is infused with negligence concepts. Indeed, strict liability theory at its core, as has been developed in Pennsylvania, incorporates the principle of risk-utility (or cost-benefit) balancing derived from negligence theory. *See id.* at 667–68 & n. 5, 841 A.2d at 1013–14 & n. 5 (Saylor, J., concurring, joined by Castille, J. and Eakin, J.).[14]

---

**13.** Obviously, all Justices are not of a like mind on this subject, as this appeal involves subsidiary issues.

**14.** By way of further background, the risk-balancing approach became integrated into our jurisprudence as products litigation evolved from the "prototype" cases involving manufacturing defects to design and warning cases, because the application of strict liability proved to be far more problematic in the latter category of cases. Design and warning cases presented a particular problem under the then-existing approach, because, given the tort system's largely open-ended damages scheme, and the impossibility of designing products incapable of contributing to human injury, there was a risk of creating an absolute liability regime. *See, e.g., Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 365 N.W.2d 176, 181–82 (1984). Thus, doctrinal limiting principles were introduced to contain the liability of product manufacturers and suppliers. *See Azzarello,* 480 Pa. at 558, 391 A.2d at 1026. *See generally Phillips,* 576 Pa. at 667, 841 A.2d at 1013 (Saylor, J., concurring, joined by Castille, J. and Eakin, J.) ("[T]he intent of the Second Restatement was not to render the manufacturer an insurer of his product, responsible for any

This no-negligence-in-strict-liability rubric has resulted in material ambiguities and inconsistencies in Pennsylvania's procedure. *Accord* James A. Henderson, Jr. & Aaron D. Twerski, *Achieving Consensus on Defective Product Design*, 83 CORNELL L.REV. 867, 897 (1998) ("Pennsylvania has, by common agreement, developed a unique and, at times, almost unfathomable approach to products litigation."). Briefly, the Court's attempts to isolate strict liability theory in its entirety from negligence theory has led to risk-utility balancing by trial courts on facts most favorable to the plaintiff (to avoid entangling the trial judge in determining factual questions assigned to the jury under *Azzarello* ). *See Phillips*, 576 Pa. at 672–73, 841 A.2d at 1016–17 (Saylor, J., concurring, joined by Castille, J. and Eakin, J.) (citing John M. Thomas, *Defining "Design Defect" in Pennsylvania: Reconciling Azzarello and the Restatement (Third) of Torts*, 71 TEMP. L.REV. 217, 232 (1998)). Further, the scheme has yielded minimalistic jury instructions (to insulate the jury from negligence terminology) which lack essential guidance concerning the key conception of product defect. *See id.* at 672–74, 841 A.2d at 1016–18 (citing John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. 825, 831–32 (1973) and Thomas, *Defining "Design Defect" in Pennsylvania*, 71 TEMP. L.REV. at 225). Moreover, the no-negligence rubric has been used to narrow the defenses available in strict liability actions. *See, e.g., Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 536 Pa. 1, 8, 637 A.2d 603, 606 (1993) (rejecting comparative negligence as a defense, explaining "[t]hroughout the development of § 402A liability, we have been adamant that negligence concepts have no place in a strict liability action."). At the same time, however, advocates for the present system continue to argue that core negligence concepts—such as foreseeability—should be used to expand the scope of manufacturer liability. *See, e.g.,* Arthur L. Bugay, *Pennsylvania Products Liability at the Crossroads: Bugosh, Berrier and the Restatement (Third) of Torts,* Pa. Bar Ass'n Quarterly, Vol. LXXXI, No. 1, at 30–32 (Jan.2010)

and all harm caused from the use of its product, regardless of the product's utility and relative safety.").

(advocating bystander recovery in strict liability on the ground that "Pennsylvania has made foreseeability an indelible part of strict products liability claims.").

In *DGS*, this Court commented on the fundamental imbalance, dissymmetry, and injustice of utilizing the no-negligence-in-strict-liability rubric to stifle manufacturer defenses, while at the same time relying on negligence concepts to expand the scope of manufacturer liability. *See DGS*, 587 Pa. at 258, 898 A.2d at 603. Similarly, the Third Circuit has commented on the "confusion that has resulted from attempting to quarantine negligence concepts and insulate them from strict liability claims." *Berrier*, 563 F.3d at 55. This Court allowed appeal in *Bugosh* to address the foundational problems in the existing doctrine, but that appeal was subsequently dismissed as improvidently granted. *See Bugosh*, 601 Pa. at 277, 971 A.2d at 1228.[15] Moreover, after a failed effort to obtain certification from this Court to resolve at least some of the foundational concerns,[16] the Third Circuit attempted to put them to rest by predicting that we would adopt the approach embodied in the Restatement Third of Torts. *See Berrier*, 563 F.3d at 52–60.

■ Notwithstanding the Third Circuit's prediction, however, the present status quo in Pennsylvania entails the continued application of Section 402A of the Restatement Second, subject to the admonition that there should be no further judicial expansions of its scope under current strict liability doctrine. *See DGS*, 587 Pa. at 254 & n. 10, 898 A.2d at 601 & n. 10. This case was not selected to address the foundational concerns, and, accordingly, the pathways to global resolution are not developed in significant detail in the briefing. Thus, we can do little more here than to remark that the difficulties

**15.** This author and Chief Justice Castille dissented to the dismissal and set out our position at length concerning avenues for resolution. *See Bugosh*, 601 Pa. at 279–312, 971 A.2d at 1229–49 (Saylor, J., dissenting, joined by Castille, C.J.).

**16.** This author and Chief Justice Castille offered an explanation of our own rationale for the denial of certification. *See Berrier*, 598 Pa. at 595–97, 959 A.2d at 901–02 (Saylor, J., concurring, joined by Castille, C.J.).

persist, and to proceed to address the specific questions presented with them—and *DGS's* admonition—in mind.

## 2. Waiver

 Upon our review, we agree with Appellees that the question of the viability of the product-line doctrine in Pennsylvania should be deemed waived since it was not raised by Appellant at trial or in the Superior Court. In the first instance, while Appellant's argument may be colorable that Rule 302(a), on its terms, does not pertain to this Court's discretionary review, our case law makes it plain that the rule applies. *See, e.g., Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 552 n. 7, 981 A.2d 145, 153 n. 7 (2009). *See generally* G. RONALD DARLINGTON ET AL., 20 WEST PENNSYLVANIA PRACTICE SERIES, PENNSYLVANIA APPELLATE PRACTICE § 302:61, at 459–60 (2009–10 ed.) ("[D]ecisional law has made clear that . . . , where an issue is raised in the Supreme Court, it must have been raised in both the lower court and the intermediate appellate court in order to be preserved for review."). Thus, at least as a general rule, satisfaction of the criteria in the notes to Rule 1114 does not displace matters of issue preservation and presentation.

In terms of Appellant's futility rationale, we recognize that there are good reasons supporting an approach that does not require useless objections, and many courts have ascribed to such practice. *See, e.g., State v. Ledbetter*, 275 Conn. 534, 881 A.2d 290, 307 (2005) (explaining that "the defendant was not required to make futile arguments before the trial court in order to prevent waiver of those arguments before this court"). Nevertheless, there are also very good reasons supporting a requirement that potential challenges be identified early in litigation, not the least of which are to channel the appellate review and afford fair notice to opposing parties of what may be to come at later stages. Indeed, knowledge of the matters which will be available to be raised on appeal may affect decisions which shape litigation, including tactical and settlement choices. For example, in a case in which the plaintiff has the option of proceeding against the defendant on

strict liability and/or negligence theories, the plaintiff may choose to proceed in negligence if she knows whether or not the foundation of the strict-liability case may be susceptible to disruption on appeal.[17]

In response to Appellant's invocation of the *Cleveland* and *Kuchinic* cases, those are matters in which civil litigants proceeded at trial in good faith reliance on the existing state of the law, but the law changed during the pendency of the appeals. *See Cleveland,* 547 Pa. at 410, 690 A.2d at 1150; *Kuchinic,* 422 Pa. at 622–23, 222 A.2d at 898–99. In such circumstances, the Court sought to eliminate the need to preserve multi-fold issues to account for the perhaps remote possibility of legal changes occurring for other reasons during the course of litigation. We find such scenarios to be materially distinct from the situation in which a litigant wishes to bring about material changes to the law in its own case.

In terms of the burden on the courts in entertaining the objections, we find this to be modest, particularly where the litigant acknowledges the binding nature of the prevailing precedent but merely indicates that it wishes to preserve a challenge for review on later appeal. Again, the salutary effect of narrowing the scope of appeals from an earlier stage of litigation is to put the court and all parties on appropriate notice and to facilitate informed decision making.

█ For similar reasons, in recent decades, this Court has taken a stricter approach to waiver than many other jurisdictions, for example, by abolishing the plain error doctrine.

---

17. We recognize that Pennsylvania courts have applied a futility approach in the administrative arena as an exception to the requirement of administrative exhaustion. *See, e.g., Pa. Pharmacists Ass'n v. DPW,* 733 A.2d 666, 672 (Pa.Cmwlth.1999). Nevertheless, since administrative exhaustion embodies its own set of concerns unique to the agency context, we find the doctrine of administrative futility to be of limited relevance here. Moreover, even in the less formal setting of agency adjudications, care is taken to ensure that the futility exception is appropriately constrained. *See, e.g., id.* at 673 ("Courts should not lightly assume the futility of a party's pursuing an administrative remedy"); CHARLES H. KOCH, JR., 4 ADMIN. L. & PRAC. § 12:22 (2d ed.2010) ("The presumption in favor of exhaustion must be emphasized ... and hence courts are very skeptical of exception claims and such claims only rarely succeed.").

*Compare, e.g., Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 258–60, 322 A.2d 114, 116–17 (1974) (dispensing with the plain error doctrine in civil cases in Pennsylvania), *with* Conn. Practice Book 1998, § 60–5 (embodying the plain error doctrine as applicable in Connecticut). While, again, we recognize there are countervailing considerations, on balance, we believe the general requirement that one challenging a civil verdict must raise and preserve challenges at all stages best reconciles with our existing rules and approach to trial and appellate practice.

■ We do realize that the Court, on occasion, has proceeded outside the boundaries of ordinary appellate review to decide legal questions not raised and preserved in accordance with Rule 302(a). *See, e.g., Freed v. Geisinger Med. Ctr.*, 601 Pa. 233, 971 A.2d 1202 (2009) (overruling prior precedent of the Court *sua sponte* ). *aff'd on reargument*, 607 Pa. 225, 5 A.3d 212 (2010). Nevertheless, the fact that there are extraordinary circumstances which may justify exceptions does not trump the rule of general application, which we apply here.

For the above reasons, because Appellant did not challenge the viability of the product-line exception before the trial court and the Superior Court, we agree with Appellees that the question is waived.

## B. Contours of the product-line exception

Assuming the product-line exception applies, Appellant next contends that this Court should reject the Superior Court's formulation. Appellant avers that the intermediate appellate court erred grievously by converting the fundamental litmus embodied in *Ramirez* into a loose set of advisory factors. According to Appellant, the approach embodied in the *Schmidt* panel's opinion "fails to serve the paramount goals of predictability and uniformity in the application of the law, provides no guidance whatsoever to the lower courts, and will permit the capricious imposition of liability in potentially unlimited circumstances." Brief for Appellant at 41–42; *see*

*also id.* at 35 ("[T]he Superior Court's new standardless rule of law on product line successor liability is inconsistent with settled strict liability law and public policies, swallows the well-established rule against successor liability, and dramatically expands the circumstances under which product line successor liability may be imposed far beyond what is permitted in even the minority of jurisdictions that have adopted the exception."). Furthermore, although appeal was allowed to determine the governing legal framework, Appellant invites us also to conduct a fact-specific assessment of the trial and intermediate appellate court's application of the product-line exception.[18]

Appellees, on the other hand, argue that the Superior Court implemented an adequate, albeit not preferred, formulation of the exception, adhering to the ruling in *Hill* that the *Ray* factors were mandatory, while, at the same time, maintaining a measure of flexibility by considering the *Ramirez* test and the remaining *Dawejko* factors. They advance two alternative approaches for defining the product-line exception—the test as originally set forth by the panel in *Dawejko*, which considers a variety of factors to determine whether it is just to impose successor liability, and the analysis advocated by Appellant, wherein both the *Ramirez* formulation and the *Ray* factors are mandatory requirements—urging that this Court adopt the former. Appellees contend that, under the cumulative elements of all three views, the evidence was sufficient to establish successor liability, since: it was fair to impose successor liability on Appellant, as Sinor "blatantly traded on, and profited from, all of the accumulated good will of [TBC]," Brief

---

**18.** For example, Appellant contends that, when applying the appropriate product-line assessment, it cannot be subject to successor liability, because: under *Dawejko*, what it purchased from TBC cannot be characterized fairly as all or substantially all of TBC's assets; it did not undertake essentially the same manufacturing operation as TBC; and, under the first *Ray* factor, its purchase of a small fraction of TBC's assets did not cause the destruction of Appellees' remedies against TBC. *See, e.g.,* Brief for Appellant at 52 (arguing that "TBC would have gone out of business and ceased to exist regardless of whether [Sinor] had purchased some of its assets. TBC's decision to liquidate, not its agreement with [Sinor], caused the destruction of [Appellees'] remedies against TBC").

for Appellees at 32; [19] Sinor produced "essentially the same" product line as TBC, whether the product line is defined as "emergency vehicles" or "fire suppression vehicles," *see Schmidt,* 958 A.2d at 513–14; and Sinor purchased substantially all of TBC's "meaningful assets," *i.e.,* those related to its fire truck business. Brief for Appellees at 43. To the extent this Court might require an additional finding that the successor caused the destruction of the plaintiffs' remedies against the original entity, Appellees aver that it was TBC's sale of its assets to Sinor—not TBC's status as "insolvent"—that destroyed Appellees' redress against TBC.

Initially, it obviously poses some difficulty for this Court to address the boundaries of the product-line exception, where we have not yet decided on developed reasoning whether to adopt it in the first instance. Nevertheless, there is confusion manifest in both the trial and intermediate appellate courts' opinions, which arises from inconsistencies in the Superior Court's application of the exception it has adopted.

The primary source of the confusion arises from *Hill's* statement that *Dawejko* made the *Ray* factors mandatory, *see Hill,* 412 Pa.Super. at 328, 603 A.2d at 606, when the *Dawejko* court did not so indicate. In fact, the *Dawejko* panel took pains to clarify that it was adopting the *Ramirez* test as the core, governing standard, subject to more flexible consideration of other relevant factors, including those identified in *Ray. See Dawejko,* 290 Pa.Super. at 26, 434 A.2d at 111. Since *Hill* and *Dawejko* are irreconcilable—as *Hill* misread *Dawejko*—it simply was not possible to be faithful to both.

In the present case, the efforts of the trial court and the Superior Court to reconcile *Hill* and *Dawejko* did not cure the

19. *See, e.g.,* Brief for Appellees at 33 ("Having acquired the rights to the 'Boardman' name and the exclusive right to make 'Boardman' emergency vehicles, Sinor undertook an aggressive advertising campaign designed to mislead the public into believing that they were the same 'Boardman' company that had been around for 65 years when in reality they had never made a single emergency vehicle!"); *id.* at 38–39 ("It would offend one's sense of justice and fairness if [Sinor] could claim 'ownership' of all those prior fire trucks for the purpose of making profit yet disclaim ownership for the purpose of avoiding liability for horrific injuries caused by those same vehicles.").

disharmony. For example, it is not possible to adhere to *Dawejko* without recognizing that *Ramirez* supplies the over-arching statement of the product-line exception. *See Dawej-ko,* 290 Pa.Super. at 26, 434 A.2d at 111 ("The formulation of the court in *Ramirez v. Amsted Industries, Inc., supra,* is well-put, and we adopt it."). Yet, the *Schmidt* panel relegated *Ramirez* to a position subordinate to *Ray* while purporting to adhere to *Dawejko. See Schmidt,* 958 A.2d at 505–07 ("[T]he only stated mandatory requirements of the product-line excep-tion in Pennsylvania [are] the three *Ray* factors[.]").

The *Schmidt* panel exacerbated the inconsistency in its discussion of the trial court's jury instruction. According to the panel's reasoning, although the *Ray* factors are mandatory in a product-line decision, a jury tasked with such a decision need not be told this. *See id.* at 515. Rather, the panel indicated, "[i]n the absence of a special verdict sheet detailing all of the factors of the product-line exception, it is irrelevant whether the jury specifically found the existence of the three *Ray* factors, as long as the evidence was sufficient to establish these factors." *Id.*

To the contrary, to the degree the *Ray* factors were manda-tory, it is not irrelevant—rather, it is essential—that the decision maker find those factors present. Therefore, if the *Ray* factors were mandatory, there can be no effective substi-tute for a jury tasked with determining the applicability of the product-line exception being told this. The bare litmus of sufficiency review cannot correct a fundamental error in the instructions to lay jurors concerning just what it is that they are deciding. Moreover, while parties may be required to seek special verdicts to contest a particular jury finding that is not necessarily inherent in the verdict, the insulation attend-ing a general verdict assumes the jury was set out on the appropriate task in the first instance.

For the above reasons, if governing Superior Court prece-dent firmly established the *Ray* factors as mandatory, it would be appropriate for us to reverse unless we were able to find

that the omission was non-prejudicial.[20] In any event, however, as discussed above, the *Schmidt* panel's elevation of the *Ray* factors to mandatory status was based on a plain misreading of the seminal product-line decision in *Dawejko*. Thus, the most appropriate approach to reconciling governing Superior Court precedent is to correct *Hill's* mistake and to revert to *Dawejko*.

◼ In terms of the present case, while the trial court's Rule 1925 opinion can be read as centered on *Ray,* the instruction the court gave to the jury at trial was entirely faithful to *Dawejko*. The charge opened with the operative *Dawejko* language, and the various other factors identified in *Dawejko* were identified as criteria which are "also used" in the product-line assessment. *See* N.T., Sept. 14, 2006, at 1259–60 (quoted previously). Accordingly, we conclude that the instruction achieved the most appropriate reconciliation of governing Superior Court precedent, as reflected in our discussion above.[21]

◼ One other aspect of the Superior Court's treatment of the product-line rule is particularly problematic. In addressing Appellant's claim that the evidence that TBC sold its custom steel fabrication assets to BI, the panel determined that the disposition of corporate assets outside the relevant product line is irrelevant. *See Schmidt*, 958 A.2d at 517. The panel's rationale, in this regard, was fairly cursory:

20. We stress that such an inquiry is distinguishable from the sufficiency review accomplished by the Superior Court panel in this case. *See Hart v. W.H. Stewart, Inc.,* 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989) (discussing the harmless error doctrine as applicable to civil cases).

21. Even if this were not so, there would be a substantial question whether any error in the charge should be regarded as non-prejudicial, since the jury was authorized to take Sinor's misleading advertising as an admission of successor status.

We realize that such instruction may be suspect (as it was predicated on evidentiary principles ordinarily administered by a judge and might be regarded as conflating a factual issue with a form of judicial estoppel). Nevertheless, there is no challenge to this charge before us, and, on our review of the present record, it served as a powerful, alternative basis to support the application by the jury of the product-line exception.

Were we to hold otherwise, then our decision would elevate the form of corporate transactions over their substance, and would make it virtually impossible for a corporation with separate divisions/businesses to produce a successor corporation, if that corporation sold its assets to distinct corporate entities along the lines of its separate divisions/businesses.

*Id.*

While the Superior Court's rationale is relevant as far as it goes, it fails to address countervailing considerations or confront the potential for misdirection associated with charging jurors with a somewhat loose interests-of-justice assessment of "philosophical origin," but depriving them of a full picture regarding the plaintiff's inability to recover from the actual manufacturer. Indeed, the larger perspective is facially relevant to whether a putative successor purchased all or substantially all of the manufacturing assets and whether the acquisition caused the virtual destruction of a plaintiff's remedies.[22] It is impossible, for example, to say with confidence that a sale of a portion of a company's assets caused the virtual destruction of a plaintiff's remedies if the fact finder does not know the full range of those assets in the first instance, and how the majority of them were disposed of by the manufacturer. Indeed, if BI was, in fact, a successor under *de facto* merger or mere continuation theories, as Appellees had alleged when they named it as a defendant, then, *per force*, the sale to Sinor would not have destroyed all other of Appellees' remedies.

Accordingly, to the degree the *Schmidt* panel intended a bright-line rule closely limiting the evidence concerning product-line successor status, we find such an approach to be untenable.[23]

---

**22.** Even under the Superior Court's view that "all or substantially all of the manufacturing assets" means only those assets in the relevant product line, Appellant's proffer concerning the sister-company transaction between BI and TBC suggests that facilities and production equipment utilized in the fire-engine and custom steel fabrication lines of the business overlapped to a significant degree. *See, e.g.,* Memorandum of FSV/Sinor in Opposition to Plaintiffs' Motion *In Limine* Re: References to Boardman, Inc., at 4–10.

**23.** Further consideration of the evidentiary issues connected with BI is not appropriate, since review was not sought and appeal was not

Finally, we take this opportunity to highlight several other matters which are not resolved by our present opinion. First, as noted, the case is not a suitable vehicle in which to resolve foundational concerns pertaining to Pennsylvania's strict products liability regime. The question of whether the product-line exception should be maintained in Pennsylvania is waived, and, thus, our consideration of it is postponed. The issue of whether a determination of product-line successor status is for the judge or the jury is not before us.[24] We also do not pass on the correctness of the authorization to the jury to find Appellant liable as a successor by admission. *See supra* note 21. It is likewise beyond the scope of this appeal to engage in the fact-specific, sufficiency-like assessment concerning *Dawejko's* application in this case which Appellant requests.

allowed to consider them. We do take this opportunity, however, to observe that Appellees took inconsistent positions relative to BI. On the one hand, they asserted that recovery was available from it and, in fact, accepted a settlement. For purposes of Appellant's liability, however, they maintained before the jury that all other remedies had been destroyed.

Appellees applied a similar tactic with regard to CVFD—they sued the fire department in negligence and accepted settlement for the full amount available consistent with governmental immunity. Nevertheless, at trial, where Appellees' focus was on Appellant, a plaintiffs' attorney told the jury that "there is no way you can say [the firemen] did anything wrong." N.T., Sept. 5, 2006, at 99. Indeed, the attorney entreated the jury, in closing, to "take that burden off [the firemen's'] shoulders and tell them, It wasn't your fault." N.T., Sept. 14, 2006, at 1230.

In light of the above, there is some resonance to Appellant's position that it was relegated unfavorable "last man standing" treatment. Memorandum of FSV/Sinor in Opposition to Plaintiffs' Motion *In Limine* Re: References to Boardman, Inc., at 13. Such treatment in strict products liability cases may be relevant when this Court is finally able to resolve the foundational concerns which have been raised.

24. Certainly, Appellees' position that the exception is an "equitable remedy" suggests that it might more appropriately be determined by a judge. *See, e.g.*, Pa.R.Civ.P. No. 1038.3 (reflecting the traditional allocation of equitable decision-making to the trial judge, while providing for advisory jury determinations concerning associated factual matters). Moreover, the "philosophical origin" and the looseness engrafted on the exception by *Dawejko*, encompassing the task of balancing a litany of factors (as contrasted with deciding factual matters in the context of a clearly articulated framework), also appears to militate in favor of allocating the decision to a judge.

We hold only that, under the most appropriate reconciliation of presently prevailing Superior Court precedent, the trial court did not err in its main instruction to the jury—under *Dawejko*—concerning the product-line exception.

### III. Physical Injury

We turn next to the remaining issue on appeal, which is also one of first impression in this Court: whether a plaintiff must prove a physical injury to recover under a strict products liability theory.

Appellant argues that the trial court erred in refusing to mold the verdict to exclude damages for emotional distress, in light of its position that none of the bystander witnesses sustained a "physical harm" from the alleged defective product. Appellant rejects the Superior Court's conclusion that courts have generally defined "physical harm," as used in Section 402A, to "encompass[ ] injury that solely manifests itself in the form of emotional shock and disturbance." *Schmidt*, 958 A.2d at 520 n. 7. According to Appellant, "no court has held that a non-user can recover for stand-alone emotional harm under Section 402A." Brief for Appellant at 60 (citing Dale Joseph Gilsinger, *Bystander Recovery Under State Law for Emotional Distress from Witnessing Another's Injury in Products Liability Context*, 90 A.L.R.5th 179, §§ 10–16 (2001)).

Appellant maintains that this Court has declined to extend strict liability so as to encompass emotional distress unaccompanied by a physical injury or physical impact. *See Simmons v. Pacor, Inc.*, 543 Pa. 664, 676–77, 674 A.2d 232, 238 (1996) ("It is the general rule of this Commonwealth that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress unless they are accompanied by physical injury or physical impact."). This restraint, Appellant asserts, is consistent with the approach of courts of other jurisdictions, which have invoked Section 402A's express physical injury requirement to bar a plaintiff from recovering for purely emotional damages. *See* Brief for Appellant at 61 (collecting cases). To the extent

that Appellees assert that post-traumatic stress disorder constitutes a physical injury for purposes of Section 402A, Appellant suggests that this argument is not appropriately presented at the present stage, because the question previously framed before the trial court and intermediate appellate courts was posed solely as whether emotional distress alone is sufficient to award damages in a strict liability action. *See* Reply Brief for Appellant at 23.

Appellant also contends that, in recognizing a claim for infliction of emotional distress, the Superior Court improperly borrowed from this Court's negligence jurisprudence. According to Appellant, "[t]he wholesale importation of *Sinn's* foreseeability-based rationale into strict liability would be inconsistent with Pennsylvania law," because this Court has repeatedly rejected extending such concepts into the strict liability arena. Brief for Appellant at 64 (citing *DGS*, 587 Pa. at 252–55, 898 A.2d at 600–01, *Phillips*, 576 Pa. at 665, 841 A.2d at 1006 (lead opinion), and *Kimco*, 536 Pa. at 8, 637 A.2d at 606). Appellant maintains that "[e]ven the Restatement (Third) of Torts, which authorizes using negligence concepts in strict liability to determine whether a product is defective, still recognizes that strict product liability plaintiffs can only recover for physical harm," which excludes purely emotional disturbance. Brief for Appellant at 65 (internal citation omitted).

Appellees initially challenge the assumption that physical manifestation of emotional distress is an additional element for a negligent infliction of emotional distress claim. *See Krysmalski v. Tarasovich*, 424 Pa.Super. 121, 622 A.2d 298 (1993); *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986). In any event, Appellees assert that they did satisfy that element, as they presented expert testimony that the family-member witnesses each suffered from post-traumatic stress disorder. Appellees find instructive a number of Superior Court panel decisions that have found physical manifestations of emotional distress, such as nausea, headaches, and insomnia, sufficient for purposes of a negligent infliction of emotional distress cause of action. *See, e.g., Toney v. Chester County Hosp.*, 961 A.2d 192 (Pa.Super.2008), *appeal granted*, 601 Pa.

388, 973 A.2d 415 (2009). According to Appellees, their presentation exceeded the evidence in those cases, particularly given the expert testimony they offered.

Responding to the no-negligence-in-strict-liability problem, Appellees take the position that such prohibition is directed to "the liability portion of the underlying claim." Brief for Appellees at 59. It is Appellees' perspective that the segregation of negligence and strict liability has nothing to do with the proof requirements for what they regard as "separate and independent" claims for emotional distress. According to Appellees:

It would be inconsistent with past decisions of this Honorable Court to declare that the independent cause of action for bystander emotional distress should be judged based on the nature of the tort giving rise to the traumatic accident which the person observed. Stated otherwise, it seems illogical to say that the viability of a bystander's claim rises and falls based on the legal theory underlying the claim asserted by *another* person.

Brief for Appellees at 59–60 (emphasis in original).

In Pennsylvania, as noted by Appellant, this Court has generally denied recovery for emotional distress, unless accompanied by physical impact or physical injury. *See, e.g., Simmons,* 543 Pa. at 676–77, 674 A.2d at 238. The Second Restatement also follows this approach. *See* RESTATEMENT (SECOND) OF TORTS § 436A (1965) ("If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."); RESTATEMENT (SECOND) OF TORTS § 456 cmt. b (1965) ("Where the tortious conduct does not result in bodily harm, there can ordinarily be no recovery for mere emotional disturbance which has no physical consequences."). Physical impact and physical injury are not synonymous terms, however. *See Simmons,* 543 Pa. at 676–77, 674 A.2d at 238.

The distinction between them is best illustrated in the negligent infliction of emotional distress context. Traditionally, under the "impact rule," a plaintiff could recover emotional distress damages only when that trauma derived from a contemporaneous physical impact. This Court first departed from that rule in *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970), a case which involved a plaintiff who suffered a heart attack after nearly being struck by the defendant's vehicle. This Court held that the plaintiff had the right to recover damages for his physical injury (the heart attack), even though he was not "impacted" by the defendant's vehicle, since this injury resulted from the plaintiff's fear of impact (mental anguish). *See id.* at 413, 261 A.2d at 90 (adopting the "zone of danger" rule, which affords a cause of action for negligent infliction of emotional distress "where the plaintiff was in personal danger of physical impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact."). In reaching this conclusion, this Court explained that the three basic arguments for perpetuating the impact rule—"medical science's difficulty in proving causation between the claimed damages and the alleged fright," "the fear of fraudulent or exaggerated claims," and "the concern that . . . a [zone of danger] rule will precipitate a veritable flood of litigation"—were outdated and flawed. *Id.* at 404–12, 261 A.2d at 85–90.

This Court further deviated from the physical impact rule in the seminal negligence case of *Sinn v. Burd*, where the *Dillon* formulation of the bystander rule was adopted. Under that rule, a plaintiff can recover damages for negligent infliction of emotional distress if she establishes that: she was located near the scene of the accident; the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident; and she was closely related to the victim. *See Sinn*, 486 Pa. at 170–71, 404 A.2d at 685 (quoting *Dillon*, 69 Cal.Rptr. 72, 441 P.2d at 920). Thus, like the zone of danger rule, the bystander rule permits recovery for emotional distress damages—at least where the plaintiff suffers a physical injury resulting from mental anguish. As justification for again rejecting the impact rule and

extending liability for plaintiffs outside of the zone of danger, this Court reasoned that, "We are confident that the application of the traditional tort concept of foreseeability will reasonably circumscribe the tortfeasor's liability in such cases. Foreseeability enters into the determination of liability in determining whether the emotional injuries sustained by the plaintiff were reasonably foreseeable to the defendant." *Id.* at 169–70, 404 A.2d at 684.[25]

Thus far, most of the decisions issued by this Court in the strict products liability arena reflect physical impact.[26] While some state courts have abandoned that requirement, their

**25.** *See also Dillon,* 69 Cal.Rptr. 72, 441 P.2d at 919 ("In order to limit the otherwise potential infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable."); *id.,* 69 Cal.Rptr. 72, 441 P.2d at 920 ("Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis.").

**26.** By way of example, the following cases reflect physical impact. *See Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966) (plaintiff suffered injuries from an exploding keg); *Forry v. Gulf Oil Corp.,* 428 Pa. 334, 237 A.2d 593 (1968) (plaintiff, a mechanic, sustained injuries from an exploding tire); *Kuisis v. Baldwin–Lima–Hamilton Corp.,* 457 Pa. 321, 319 A.2d 914 (1974) (plaintiff injured when a load of steel pipe fell on him from a crane); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975) (decedent, a pilot, died in a helicopter crash); *Francioni v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736 (1977) (plaintiff, a truck driver, injured in an automobile accident); *Azzarello,* 480 Pa. at 547, 391 A.2d at 1020 (plaintiff's hand injured while operating a coating machine); *Nath v. Nat'l Equip. Leasing Corp.,* 497 Pa. 126, 439 A.2d 633 (1981) (plaintiff's hand injured by a wire and cable stripping machine); *Williams v. West Penn Power Co.,* 502 Pa. 557, 467 A.2d 811 (1983) (plaintiffs injured when a ladder platform hoist contacted a power line); *Lewis v. Coffing Hoist Div., Duff–Norton Co., Inc.,* 515 Pa. 334, 528 A.2d 590 (1987) (plaintiff injured while operating an electric chain-hoist); *Musser v. Vilsmeier Auction Co., Inc.,* 522 Pa. 367, 562 A.2d 279 (1989) (plaintiff injured by a tractor); *Coyle v. Richardson–Merrell, Inc.,* 526 Pa. 208, 584 A.2d 1383 (1991) (parents brought action on behalf of their child who sustained malformed limbs after taking a prescription drug); *Walton v. Avco Corp.,* 530 Pa. 568, 610 A.2d 454 (1992) (decedents killed in a helicopter crash); *Cafazzo,* 542 Pa. at 526, 668 A.2d at 521 (plaintiff sustained injuries from a medical device implanted during surgery); *Davis v. Berwind Corp.,* 547 Pa. 260, 690 A.2d 186 (1997) (plaintiff's fingers were severed by a meat

decisions were largely based on negligence concepts. For instance, in *Shepard*, the California Court of Appeal recognized a right for bystanders to recover, for purposes of a products liability action, physical injuries indirectly suffered because of the emotional trauma of witnessing the death of their close relative in a car accident. *See Shepard*, 142 Cal.Rptr. at 615. In making this determination, the court transposed the bystander rule for negligent infliction of emotional distress—a rule that, as demonstrated, derives its justification from the core negligence principle of foreseeability—into the strict liability arena. *See id.* The court acknowledged the integral role foreseeability plays in the bystander rule, even in the products liability context, reasoning that "[t]he injuries complained of are as much a foreseeable consequence of a defect in design and manufacture as of the negligence of the driver[.]" *Id.*[27]

Deviating from the impact rule for strict products liability actions in Pennsylvania, however, plainly would violate this Court's admonition that foreseeability has no place in Pennsylvania's strict liability law. *See, e.g., Walton*, 530 Pa. at 584, 610 A.2d at 462 ("This Court has continually fortified the theoretical dam between the notions of negligence and strict 'no fault' liability.").[28] Although there may be valid reasons

blender); *Phillips*, 576 Pa. at 644, 841 A.2d at 1000 (decedents killed in a house fire); *Harsh v. Petroll*, 584 Pa. 606, 887 A.2d 209 (2005) (decedents killed in an automotive fire); *Straub v. Cherne Indus.*, 583 Pa. 608, 880 A.2d 561 (2005) (plaintiff injured by an exploding device); *Barnish v. KWI Bldg. Co.*, 602 Pa. 402, 980 A.2d 535 (2009) (plaintiffs injured in a plant explosion).

27. Relatedly, in *Walker*, the Iowa Supreme Court determined that a bystander could recover damages for the mental anguish she sustained from witnessing the death of a close relative under a strict products liability theory, reasoning that there was "no qualitative difference, once liability is found, between recoveries under theories of negligence, strict liability, or warranty." *Walker*, 320 N.W.2d at 563. This conclusion was predicated on two of the court's earlier decisions: *Barnhill v. Davis*, 300 N.W.2d 104 (Iowa 1981), which adopted the *Dillon* formulation of the bystander rule; and *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7 (Iowa 1977), a case that extended the doctrine of strict products liability to include bystanders.

28. *See also Phillips*, 576 Pa. at 656, 841 A.2d at 1007 (lead opinion) ("[W]e can, and do, reaffirm that in this jurisdiction, negligence con-

for moving beyond the impact rule, "too much of Pennsylvania's scheme of liability without fault has been fashioned on the notion that negligence-based concepts have no place in strict liability" to permit the scope of manufacturer liability to be broadened on the basis of such concepts. *DGS*, 587 Pa. at 259, 898 A.2d at 604. We remain committed to *DGS's* recognition that the existing doctrine is not to be expanded on its own terms, *see id.* at 254 n. 10, 898 A.2d at 601 n. 10; *see also Phillips*, 576 Pa. at 657, 841 A.2d at 1007 (lead opinion); *id.* at 674–75, 841 A.2d at 1018 (Saylor, J., concurring, joined by Castille, J. and Eakin, J.), pending reevaluation and adjustment to address the deficiencies which have become apparent. *See supra* § II(A)(1).

We also reject Appellees' position that a claim for emotional distress is entirely separable from the nature of the tort on which it is predicated. In tort cases, the scope of available damages may be different, depending on the degree of the defendant's culpability. For example, the Restatement Second recommends that damages for pure emotional distress should not be available under a negligent infliction theory, *see* RESTATEMENT (SECOND) OF TORTS § 313 cmt. a (1965), but may be awarded under an intentional infliction theory where there is outrageous conduct, *see* RESTATEMENT (SECOND) OF TORTS § 46 (1965). More generally, as a defendant's culpability increases (on the scale of faultless to negligent to intentional), the range of available damages tends to widen in light of the inherent connection between culpability and responsibility which was the traditional center of the law of torts. Thus, *per force*, a plaintiff who proceeds based on negligence theory to support a

cepts have no place in strict liability law. Such a firm division between the causes of action is not a senseless exercise in semantics; rather, it is dictated by the very underpinnings of the strict liability cause of action."); *id.* at 657, 841 A.2d at 1007 ("We also explicitly state that a manufacturer will not be held strictly liable for failing to design a product that was safe for use by any reasonably foreseeable user as such a standard would improperly import negligence concepts into strict liability law."); *Kimco*, 536 Pa. at 8, 637 A.2d at 606 ("Throughout the development of § 402A liability, we have been adamant that negligence concepts have no place in a strict liability action."); *Lewis*, 515 Pa. at 341, 528 A.2d at 593 ("[N]egligence concepts have no place in a case based on strict liability.").

claim of damages for emotional distress implicates negligence principles, and a plaintiff who invokes strict liability implicates principles and limitations associated with that doctrine.

Despite all that has gone before, Mr. Justice Baer, Madame Justice Todd, and Mr. Justice McCaffery would borrow liberally from negligence theory to sanction a new cause of action for strict liability infliction of emotional distress, making no effort to square such position with the repeated admonition of this Court that negligence principles have no place in strict liability, *see supra* note 28; the disharmony in relying on negligence precepts to expand manufacturer liability under Section 402A when the Court has disallowed defenses based on the no-negligence-in-strict liability rubric, *see, e.g., Kimco,* 536 Pa. at 8–9, 637 A.2d at 606–07; or the accord struck in *DGS. See DGS,* 587 Pa. at 254 n. 10, 898 A.2d at 601 n. 10.[29]

The evident disparities are particularly acute in this case, where Appellant has been held to answer for a defect in a product it did not manufacture (and never manufactured), based on a successor-liability theory unique to strict-liability jurisprudence.[30] Justices Baer, Todd, and McCaffery, nonetheless, show no qualms about simultaneously jettisoning integral limitations of strict-liability theory to expand Appellant's

29. As we have explained at length, this appeal arises in the context of Pennsylvania's unique strict-liability scheme characterized by the Court's imperfect efforts to isolate strict products liability from its roots in negligence theory. *Cf., e.g., Dillinger v. Caterpillar, Inc.,* 959 F.2d 430, 437 ("The Pennsylvania Supreme Court, perhaps more than any other state appellate court in the nation, has been emphatic in divorcing negligence concepts from product-liability doctrine." (citation omitted)). Thus, we fail to see the relevance of the decisions of other courts, cited by Justices Baer, Todd, and McCaffery, which have accepted the theoretical interconnectedness.

30. To perpetuate this litigation would be particularly troublesome since, as explained, Appellant was precluded at trial from adducing evidence of Appellees' settlements with BI, which Appellees also contended was a Boardman successor and with whom Appellees entered into a monetary settlement. *See supra* note 23 (commenting on Appellant's complaints regarding the "last man standing" treatment it received from the trial court). While such matters are not directly relevant to the legal issues accepted for review, in our view, they do have some bearing on any decision to award a new trial based on a damages theory not previously articulated by Appellees.

damages exposure. Further, those Justices would sanction a new damages trial based on an interjected legal theory distinguishing derivative physical injury from underlying emotional distress, which never was pursued by Appellees in the first instance (since, as previously observed, Appellees asked for and received a jury charge on "mental pain, anguish, suffering, and distress," N.T., Sept. 14, 2006, at 1266–67).[31]

We have no doubt that the bystander witnesses in this case have suffered severe emotional trauma. Nevertheless, the social effects of expanding a scheme of liability without fault

31. Paradoxically, while interjecting a theory of their own, Justices Baer, Todd, and McCaffery assert that it is beyond the scope of the appeal to address arguments Appellant has made from the outset concerning the impact rule. *See* Concurring Opinion and Opinion in Support of Vacation and Remand at 374–75, 11 A.3d at 953-54 (Baer, J., joined by Todd, J. and McCaffery, J.).

In our view, the impact rule, and its abrogation in the negligence arena, is within the scope of this appeal. We have recognized that the terms "physical injury" and "physical impact" are not identical; nevertheless, the former term intersects with the latter in circumstances in which physical harm results. Concomitantly, in the Petition for Allowance of Appeal, Appellant treated "physical injury" as subsuming physical injury "by the hose"—or impact injury; highlighted this Court's assiduous adherence to the no-negligence-in-strict-liability admonition; and challenged the Superior Court's reliance on *Sinn* as misplaced, because *Sinn* implemented negligence theory. Petition for Allowance of Appeal at 23–25 & n. 12. This Court then accepted the questions presented by Appellant for review verbatim.

Moreover, the trial court, the intermediate court, and the parties treated Appellant's references to physical injury to subsume physical impact. *See Schmidt*, No. GD 05–007191, *slip op.* at 24–25 (finding that Lindsay Schmidt was entitled to emotional distress damages under a tort of infliction of emotional distress, even though she did not sustain a *"physical injury."* because, *inter alia,* "courts of this Commonwealth have long abandoned the *'impact rule'* previously needed for a plaintiff to recover in a claim for emotional distress" (emphasis added)); *Schmidt*, 958 A.2d at 518–19 (adopting the trial court's reasoning as its own); Brief for Appellees, *Schmidt v. Boardman Co.*, 958 A.2d 498 (Pa.Super.2008) (No. 905 WDA 2007), 2007 WL 6370169, at *40 n. 25 (viewing "physical injury" as synonymous with "physical impact"); *id.* at *41 (same). Thus, we do not regard it as prudent or fair—at this late juncture—to narrow the field on which the case has been presented and addressed on account of some arguably imprecise phraseology utilized by Appellant in framing the questions presented. Indeed, we do not believe it is reasonably possible to extricate the impact rule, or the reasons supporting this Court's departure from it in the negligence setting, from the theories at the center of this appeal.

must be considered carefully before such innovations may be rationally implemented.[32] As Appellant suggests, legislative involvement in addressing such effects is desirable. *See Naylor v. Twp. of Hellam*, 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the General Assembly's superior ability to examine social policy issues and determine legal standards so as to balance competing considerations).[33]

Unless and until the Legislature intervenes, however, this Court remains charged with the reasoned administration of

32. Countering the loss-spreading rationale advanced by Appellees, courts and commentators have come to recognize the impact on businesses and the economy at large of an expanded liability scheme encompassing liability without fault. For example, one commentator has indicated:

> Between 1971 and 1976[, in the wake of the implementation of strict products liability in courts around the country], the cost of product liability insurance premiums increased drastically. According to 1984 Department of Commerce statistics, America's foreign competitors had insurance costs twenty to fifty times lower than their American counterparts....

> Not only is insurance unobtainable for many manufacturers, the tort system is not an effective insurance delivery mechanism. A study by the Rand Corporation's Institute for Civil Justice found that the legal system incurred a total transaction cost of $16 to $19 billion in 1985 to deliver $14 to $16 billion of net compensation to plaintiffs. According to Professor George L. Priest of Yale University Law School, the result of the expanded tort liability has been to "shift insurance delivery to a third-party mechanism." He views such a system as inefficient. It provides insurance in excess of consumer demand, and the administrative burden is approximately 2.75 to 5.75 times greater than a first-party delivery system.

William A. Worthington, *The "Citadel" Revisited: Strict Tort Liability and the Policy of Law*, 36 S. Tex. L.Rev. 227, 250–52 (1995) (footnotes omitted); *see also id.* at 241 (positing that, as a result of the courts' application of a loss-spreading rationale in the tort context, "legal analysis became contorted as courts struggled to reconcile compensation with traditional tort principles. Ultimately, the credibility of our legal system has suffered.").

The point here is not to accept or adopt these particular assertions. Rather, we aim only to highlight the inappropriateness of judicially expanding a loss-spreading scheme detached from fault without seriously considering the empirical validity of underlying assumptions about societal impact.

33. The broader tools available to the political branch in making social policy judgments, including the availability of comprehensive investigations, are discussed in *Pegram v. Herdrich*, 530 U.S. 211, 221–22, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000).

the common law. In this landscape, we have determined that the present system of strict products liability should be closely limited according to its existing theoretical underpinnings pending reevaluation. In particular, this means that negligence concepts simply are not available to support continuing expansions of a strict liability scheme premised on the notion that negligence theory has no place there.

Accordingly, we would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact.

The order of the Superior Court is affirmed on different grounds with respect to the "product-line exception issues" and by operation of law (the Court being equally divided) with respect to the "physical injury issue."

Jurisdiction is relinquished.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD, and McCAFFERY join the Opinion as to Parts I and II.A. Chief Justice CASTILLE and Justices EAKIN, BAER, and McCAFFERY join the Opinion with respect to Part II.B. Chief Justice CASTILLE and Justice EAKIN join the Opinion with respect to Part III.

Justice BAER files an opinion concurring in part and in support of vacation and remand in part, in which Justice McCAFFERY joins and in which Justice TODD joins in part.

Justice TODD files an opinion concurring in part and in support of vacation and remand in part.

Justice BAER, concurring in support of vacation and remand.

I join in full Parts I and II of the Opinion of the Court, regarding the product line exception to the rule against successor liability. I agree that Appellant Sinor Manufacturing

waived its argument concerning the viability of the doctrine as part of Pennsylvania law, and further concur with the discussion concerning the contours of the exception itself.

In regard to Part III, however, I respectfully cannot concur that the judgments in favor of Joyce Schmidt, Lindsay Schmidt, and Lauren Jeffress (hereinafter, Appellees) for their respective claims of infliction of emotional distress should be outright reversed. As developed below, I would hold that persons who contemporaneously witness a close family member incur serious bodily injury as the result of a defective product possess a cognizable cause of action for the emotional distress suffered from observing such an incident so long as they meet the "physical harm" requirements of Section 402A(1) of the Restatement (Second) of Torts and Pennsylvania common law. I would further hold that plaintiffs can meet this physical harm requirement by pleading and proving a physical manifestation arising from their emotional distress. Nevertheless, because the jury in the instant matter was not instructed to consider only the physical manifestation of the emotional injuries suffered, I would vacate that portion of the verdict and order a new trial.

As established in the order granting allocatur, this appeal only presents the question of "whether a plaintiff must prove a physical injury in order to be entitled to recover under a strict product liability theory." *Schmidt v. Boardman Co.*, 601 Pa. 381, 973 A.2d 411 (2009) (*per curiam*). In concluding that Appellees' claims for emotional distress should be reversed, the Opinion in Support of Reversal authored by Mr. Justice Saylor, and joined by Mr. Chief Justice Castille and Mr. Justice Eakin (OISR), determines that "for purposes of a strict liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact." OISR Slip Op. at 50. Such a finding, however, is not supported by the plain language of Section 402A of the Restatement (Second) of Torts or Pennsylvania strict products liability jurisprudence; nor does it answer the question squarely before this Court.

Relevant to this case, Section 402A(1) provides,

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer [ . . . ] is subject to liability for physical harm thereby caused to the ultimate user or consumer [ . . . ].

Restatement (Second) Torts § 402A(1). Contrary to the OISR's holding herein, Section 402A does not require a "physical impact" for recovery for injuries sustained from a defective product. Rather, the Restatement merely requires that one be "physically harmed." Indeed, the OISR notes that "[p]hysical impact and physical injury are not synonymous terms. . . ." OISR Slip Op. at 41. In common usage, "to injure" relates specifically to the harm done to another: "to cause physical harm; to hurt." The American Heritage College Dictionary 714 (4th ed.). "To impact" someone or something, however, does not require harm; rather, it is "the striking of one body against another; collision." *Id.* 694. Further, Section 7 of the Restatement, which contains definitions of terms to be used throughout the Restatement, defines "physical harm" as "physical impairment of the human body. . . . Where the harm is impairment of the body, it is called 'bodily harm,' as to which see § 15." Restatement (Second) Torts § 7 cmt. e. Section 15 then defines "bodily harm" as "any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) Torts § 15. Critically, comment b to Section 15 states that disturbances to nerve centers caused by fear or shock do not constitute bodily harm, but such fear and shock may "result in some appreciable illness or have some other effect upon the physical condition of the body which constitutes bodily harm." Restatement (Second) Torts § 15 cmt. b. Conspicuously absent from these definitional sections is any reference to the term "impact." Thus, Section 402A, by its plain language, and in accord with its accompanying sections and expansive commentary, does not require, or even infer, that one must be "physically impacted" by a defective product in order for a plaintiff to recover damages. Instead, the Restatement merely requires "physical harm," or, alternatively stated, "bodily harm" or "physical impairment." All these terms, used inter-

changeably in the Restatement (Second) of Torts and this Court's jurisprudence, are functionally identical and distinct from "physical impact."

This appeal presents this Court with the opportunity to consider whether a plaintiff suffering from an emotional injury still possesses a cognizable cause of action under Section 402A. As the parties acknowledge, this question has never been answered by this Court in the context of strict liability, nor has it been resolved in the more common realm of negligent infliction of emotional distress (NIED). Nevertheless, in my view, there are several decisions of both the courts of this Commonwealth, as well as courts from other jurisdictions, which guide the instant inquiry.

Consistent with my analysis above regarding the "physical harm" requirement of Section 402A, decisions from other courts have not equated physical harm with a mere impact with the defective product. Rather, courts considering this question have found that, so long as the emotional distress alleged manifests itself physically, such as headaches, sleep-lessness, chronic stomach pains, and the like, the physical harm requirement of Section 402A will have been met. Im-portantly, however, such physical manifestation is required; it is not enough to simply suffer from emotional trauma.

For example, in *Pasquale v. Speed Products Engineering,* 166 Ill.2d 337, 211 Ill.Dec. 314, 654 N.E.2d 1365 (1995), a husband sought emotional distress damages, under a strict products liability theory of recovery, for purely psychic inju-ries he suffered from witnessing his wife die after engine parts from a racecar exploded and flew into a stand of spectators. Like Pennsylvania, Illinois has adopted Section 402A as the controlling authority for strict products liability actions. The Illinois Supreme Court, although recognizing that a physical manifestation of emotional distress was not required for a NIED claim in Illinois, declined to extend a similar rule to emotional distress claims sounding in strict liability based upon the plain language of Section 402A. *Id.,* 211 Ill.Dec. 314, 654 N.E.2d at 1372–73. Decisions by courts in Utah, Oregon, and the U.S. Virgin Islands have also held that Section 402A

requires some physical harm to result from, or manifest out of, a bystander's emotional distress arising after witnessing a traumatic event to a close family member.[1]

The United States Court of Appeals for the Third Circuit in *Walters v. Mintec/International*, 758 F.2d 73 (3d Cir.1985), also held that the plaintiff therein could recover for his physical injuries that resulted from emotional distress, despite the fact that the plaintiff was not impacted by the defective product. The plaintiff narrowly escaped being impacted by a collapsing crane, but witnessed his co-worker being crushed to death. Although the plaintiff did not suffer any immediate physical injuries, he did suffer severe mental anguish and emotional distress, which, the court found, resulted in the plaintiff suffering severe headaches, weakness under stress, insomnia, recurring nightmares, and post-traumatic stress disorder. The Third Circuit reasoned that Section 402A's "physical harm" requirement encompassed harm resulting from emotional distress because Section 7 of the Second Restatement defined physical harm as "the physical impairment of the human body" and did not impose any restrictions on the source of that harm. The court noted that Section 7 provided a definition of physical harm that is to be used consistently throughout the entire Restatement. Additionally, the court reasoned that, based on Section 7, in conjunction with Section 436, which discusses physical harm resulting from emotional distress, the authors of the Restatement believed that emotional distress could cause physical harm. *Id.* at 77. Further, the court concluded that Section 402A should not apply with less force when the physical harm to the plaintiff resulted from emotional disturbance than when the physical harm resulted from some sort of impact. *Id.* at 79.

1. *See Straub v. Paykel Health Care*, 990 P.2d 384, 390 (Utah 1999) (requiring physical harm, as contemplated by Section 402A, to a bystander alleging emotional distress caused by a defective product harming a third person); *Sease v. Taylor's Pets, Inc.*, 74 Or.App. 110, 700 P.2d 1054, 1059 (1985) (same, citing with approval Illinois strict liability jurisprudence); *see also Mingolla v. Minn. Mining & Mfr. Co.*, 893 F.Supp. 499 (D.Vi.1995).

Again, while this Court has not defined "physical harm" to date in this context, decisions from our Superior Court provide additional guidance. Within the separate, but related, context of NIED,[2] the Superior Court has noted that "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and ... ongoing mental, physical and emotional harm," sufficiently establish physical harm or injury as physical manifestations of a psychic injury. *Love v. Cramer*, 414 Pa.Super. 231, 606 A.2d 1175, 1179 (1992). A later panel of that court found "knots" in a plaintiff's stomach, nightmares, low self-esteem, being susceptible to fright, and major depression cognizable symptoms of a physical manifestation of emotional distress. *Brown v. Phila. Coll. of Osteopathic Med.,* 449 Pa.Super. 667, 674 A.2d 1130, 1137 (1996).

It is not sufficient, however, to end the analysis here. Indeed, before a plaintiff may assert a claim for emotional distress in a strict liability setting in the first instance, a plaintiff must, as a threshold matter, fall within the class of persons protected by Section 402A; thus, we must consider whether Appellees, as bystanders to this accident, are encompassed within Section 402A. More specifically, the bystander plaintiffs must still plead and prove that the defendant sold a product in a defective condition unreasonably dangerous to the user or consumer. To that end, while Section 402A lists "users and consumers" of the defective product as the members of society to whom recovery of damages is available, this Court has implicitly permitted persons who are physically harmed by a defective product, yet not the ultimate user or consumer, to recover under Section 402A. The factual circumstances of this case provide such an example—Erin Schmidt and Joeylynne Jeffress, the two young girls actually struck by the fire hose, did not use or consume the defectively designed product. Nevertheless, no one has challenged availabilities of recovery available to them under Section 402A.

2. It should be noted that it remains an open question in Pennsylvania as to whether physical manifestation of an emotional injury is a prerequisite to recovery in an NIED setting, especially when a claim of bystander liability pursuant to *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979), is alleged.

In much the same way, our seminal decision of *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), the decision in which we adopted Section 402A as the law of Pennsylvania, did not involve a plaintiff who either used or consumed a defective product, but rather, someone who merely walked into a room containing the defective product:

Charles Webb [plaintiff Nelson Webb's father] purchased a quarter-keg of beer from a distributor, John Zern. That same day, plaintiff's brother tapped the keg and about a gallon of beer was drawn from it. Later that evening, when plaintiff entered the room in which the keg had been placed, the keg exploded, severely injuring plaintiff [Nelson Webb].

*Id.* at 853. In expressly providing for recovery in such situations, the Superior Court has succinctly stated,

no reason appears to distinguish between [a person] who did not buy the product, and someone who did buy the product. If, in other words, [a manufacturer] is effectively the guarantor of (its) products' safety, the guaranty should extend to those persons who encounter the product after ... its manufacturer has released it [into the stream of commerce].

*Pegg v. Gen. Motors Corp.*, 258 Pa.Super. 59, 391 A.2d 1074, 1079 (1978). Certainly, plaintiffs who witness their loved ones be severely injured or killed by a defective product "encounter the product after ... its manufacturer has released it [into the stream of commerce]." *Id.*[3]

Once more, however, stopping the analysis at this point would be imprudent, as the proverbial floodgates could open to

---

3. I recognize that, through what has become known as the "intended use doctrine," we have limited recovery in certain circumstances to only the "intended user" of the defective product. Thus, we have precluded the estate of a small child, killed in a fire, from recovering wrongful death and survival damages, when the small child started the fire by playing with a cigarette lighter, despite the failure of the manufacturer to place a child safety device on the lighter. *See Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000 (2003) (plurality). Such reasoning is not implicated in this case, however, where the defective product (the fire engine) was being used by intended users (firemen) for its intended use (transporting fire equipment to a structure fire), yet the defective product still physically harmed a person it encountered in the stream of commerce. *Pegg, supra.*

any sort of emotional injury that manifests itself physically as a result of the defective product. In theory, should the availability of such damages not be curtailed, anyone who experiences the physical manifestation of an emotional injury, from the mother who witnesses her child struck by a fire hose, to the grandmother or family friend 3,000 miles away who is told of the accident over the telephone, could recover for the physical effects of the emotional turmoil endured.

This Court was faced with a similar situation in the context of emotional distress recovery based on negligence, and it is here where I believe that jurisprudence guides the inquiry. Generally, recovery for emotional distress in any context is not permitted absent some "bodily harm." *See* Restatement (Second) of Torts § 436A. In claims based on negligence, our common law initially relegated the "bodily harm" requirement to some sort of "physical impact" by the tortfeasor. In recognizing the "inherent humanitarianism of our judicial process," as well as the ridiculousness of affording liability based solely on spatial fortuity, this Court in *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84, 85 (1970), deviated from the "impact rule" to allow persons within the "zone of danger" to recover for emotional distress. For arguably the same reasons, a second deviation occurred, when we further permitted bystanders to an incident recover for emotional damages, so long as said bystander was (1) located near the scene of the accident; (2) the emotional distress resulted from a contemporaneous and sensory observation of the accident; and (3) the plaintiff was closely related to the ultimate victim of the accident. *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979).

Again, while I recognize that our zone of danger and bystander rules have their genesis in the negligence context, the policy concerns implicated in that context are nonetheless applicable in properly framing the scope of liability for emotional distress in cases such as the one presented instantly. Indeed, in *Pasquale, supra* p. 955, the Illinois Supreme Court recognized that, while the plaintiff therein ultimately was not entitled to damages because his emotional distress did not manifest physically (and, thus, he was not physically harmed

pursuant to Section 402A), he both was within the zone of danger of a defective product, and contemporaneously witnessed the death of his wife from that defective product. Had the plaintiff in that case suffered physical harm, he unquestionably would have been entitled to damages.

The framework under which I would decide this case so established, I turn directly to the issue before us. First, as a direct answer to the question as posed in our grant of allocatur, the record contains unrebutted and irrefutable evidence that Appellees each have physical manifestations of emotional trauma, which resulted from witnessing the incident underlying this appeal, such that they suffered "physical harm" or "physical injury" as contemplated by Section 402A. Indeed, Appellees began to suffer emotional strain and distress almost immediately after the incident. Within weeks, each was under the care of various social workers and psychiatrists. During this time, Lindsay Schmidt could not sleep or eat, suffered from panic attacks at the mere sound of a siren, and became clinically depressed. Ms. Sandra Faulkner, Lindsay's clinical social worker, diagnosed her with post-traumatic stress disorder (PTSD).[4]

Mother Joyce Schmidt suffered from an even more severe case of PTSD. She was clinically depressed, no longer possessed energy or emotion, and also suffered from panic attacks and hysteria associated with sensory observation of a fire engine or emergency siren. Moreover, as of July of 2006 (almost two years after the accident), both Lindsay and Joyce continued to suffer from the effects of chronic PTSD. Lauren Jeffress similarly endured chronic effects of PTSD, including sleeplessness and severe anxiety.

4. While psychic in origin, PTSD manifests itself in a number of physical respects, including difficulty falling or staying asleep, depression, hallucinations, stomachaches, headaches, hyper-anxiety, and difficulty in concentrating. Moreover, PTSD may be either acute and/or chronic in nature, depending upon the duration of the symptoms. *See* American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, § 309.81 (4th ed., 1994); Testimony of Carrie Seslow, Notes of Testimony, Sept. 8, 2006, at 521–29.

Second, consistent with *Pegg* and *Zern*, while not "users and consumers," Appellees are afforded the protections of Section 402A as persons injured by "the product after ... its manufacturer has released it" into the stream of commerce. *Pegg*, 391 A.2d at 1079. Finally, Appellees sought emotional harm damages under the three-part rule established in *Sinn*, *supra* pp. 957-58. They easily satisfy those three requirements to fall within the narrow avenue of available recovery: they were each located within feet of the incident when it occurred; they contemporaneously witnessed the fire hose strike Erin Schmidt and Joeylynne Jeffress, resulting in emotional distress; and each were sufficiently related to the injured victim. Thus, they are excepted from the general prohibition against emotional damages.

My analysis aside, I cannot stand in support of affirmance of the Superior Court's opinion or the verdict as rendered by the jury in the trial court. As made clear by the above construct, Appellees were required to plead and prove, and any recovery should have been limited to, physical harm suffered as mandated by Section 402A. The jury in this case, however, was not instructed concerning this requirement or that the verdict should be only for that physical harm endured. Rather, the trial court instructed the jury merely upon the three *Sinn* factors, and additionally that it should order compensation for the "mental pain, anguish, suffering, and distress, if any, which [Appellees have] endured since [the incident]." [5] Notes

5. The entirety of the relevant portion of the jury instruction is as follows:

> The second claim is for Joyce Schmidt for what is called tortuous [sic] infliction of emotional distress. According to Pennsylvania law, a plaintiff may recover for infliction of emotional distress due to the traumatic impact of viewing a close relative suffer injury as a result of tortuous [sic] conduct. The tortfeaser [sic] inflicts upon this bystander an injury separate and apart from the injury to the victim. It is your duty to consider the mental pain, anguish, suffering, and distress, if any, which Joyce Schmidt has endured since the injury to her daughter and which she may endure in the future. Similarly, Erin's sister, Lindsay, also witnessed the injury causing her sister's

of Testimony, Sept. 14, 2006, at 1266–67. The jury simply was not charged with the more objective task of "putting a number" on the amount and severity of physical harm arising as a consequence of the emotional injury. Accordingly, I would vacate the verdicts in favor of Appellees Joyce Schmidt, Lindsay Schmidt, and Lauren Jeffress, but would further remand for a new trial consistent with the construct developed herein.

Justice McCAFFERY joins this opinion.

Justice TODD joins this opinion in part.

Justice TODD, concurring in support of vacation and remand.

I join Parts I and II.A of the Opinion of the Court. In particular, I agree Appellant Sinor Manufacturing waived its argument relating to the viability of the product line exception in Pennsylvania. However, having found that the question regarding the exception's existence was waived, I would stop there, and therefore do not join Part II.B of the Opinion.

I also respectfully do not join Part III, which would reverse the judgments entered in favor of Appellees for emotional distress. With respect to the physical injury issue, I join the Opinion in Support of Vacation and Remand authored by Justice Baer.

---

death. She too may recover damages for tortuous [sic] infliction of emotional distress if you so find.

\* \* \*

Plaintiff, Lauren Jeffress, who also witnessed the accident which caused the injury to her sister, Joeylynne, and the death of Erin Schmidt, may also recover damages for tortuous [sic] infliction of emotional distress if you so find.

Notes of Testimony, Sept. 14, 2006, at 1266–67; 1268–69.