IN THE COMMONWEALTH COURT OF PENNSYLVANIA

International Chapter of Horseshoers  :
and Equine Trades, Local 947,        :
                                     :
                    Petitioner       :
                                     :
            v.                       :   No. 338 M.D. 2016
                                     :   Argued:  September 11, 2017
Pennsylvania State Horse Racing      :
Commission (Pennsylvania             :
Department of Agriculture),          :
                                     :
                    Respondent       :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


OPINION NOT REPORTED


MEMORANDUM OPINION
BY JUDGE WOJCIK                              FILED:  October 3, 2017


          Presently before the Court are the preliminary objections of the
Pennsylvania State Horse Racing Commission (Pennsylvania Department of
Agriculture) (Commission) to the Amended Petition for Review in Mandamus
(Amended Petition)[1] filed by the International Chapter of Horseshoers and Equine

---

[1] As the Pennsylvania Supreme Court has explained:

> It is axiomatic that mandamus is an extraordinary writ which lies
> to compel the performance of a ministerial act or a mandatory duty
> where there is a clear legal right in the plaintiff, a corresponding

**(Footnote continued on next page…)**

Trades, Local 947 (Union). We sustain the preliminary objections and dismiss the Amended Petition.

The Union is a labor organization with its principal office at 3 Main Street, Kings Park, NY 11754. Amended Petition at ¶1. The Union represents, among others, racetrack employees and is the recognized representative of various employees at the Hollywood Casino at Penn National Race Track (Penn National) in Grantville, Dauphin County, Pennsylvania. *Id.* at ¶¶2, 3. The Union represents farriers[2] working at Penn National including George Geist. *Id.* at ¶¶15, 16.

On February 21, 2017, the Union filed the instant Amended Petition alleging that the Commission regulates the licensing of individuals employed in the

---

**(continued…)**

> duty in the defendant, and a want of any other appropriate and adequate remedy. Mandamus does not lie to compel the performance of discretionary acts except where the exercise or non-exercise of discretion is arbitrary, fraudulent, or based upon a mistaken view of the law.

*Valley Forge Racing Association v. State Horse Racing Commission*, 297 A.2d 823, 825 (Pa. 1972) (citations omitted).

[2] *See* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 465 (1984) (defining "farrier" as "[o]ne that shoes horses or treats them medically."); Section 32(11) of the Veterinary Medicine Practice Act, Act of December 27, 1974, P.L. 995, *as amended*, 63 P.S. §485.32(11) ("This act shall not apply to . . . [f]arriers or persons actively engaged in the art or profession of horseshoeing."). *See also* the New York State Department of Labor's website, https://labor.ny.gov/stats/olcny/farriers.shtm (last visited 9/1/17) ("Farriers remove worn or defective shoes from hooves using nail snippers and pincers. They examine hooves to detect bruises and cracks, determine required trimming, and trim and shape hooves using knives and snippers. They measure hooves using calipers and steel tape and select aluminum or steel shoes to match the hoof measurement and usage. They also place leather pads, sponges, or oakum-pine tar mixtures on bruised or cracked hooves for protection. They shape shoes to fit hooves using swage, forge, and hammer. They nail shoes to hooves and file hooves flush with the shoe.").

2

horse racing industry in the Commonwealth and that farriers must be licensed as a prerequisite to employment. *Id.* at ¶¶9, 10.[3] The Union asserts that the Commission has failed to require any organization or entity to conduct an examination of applicants for a farrier's license, failed to require applicants to submit to such testing or obtain a passing score, and granted licenses to applicants without having taken or successfully passing the examination as required by its regulations and application. *Id.* at ¶¶19, 20, 21, 23, 24.[4] The Union avers that the Commission has also "taken minimal or no steps to ensure the moral character and law abiding nature of applicants for licensure" and has issued licenses to applicants who have engaged in "disqualifying activities" or who are unqualified for licensure. *Id.* at ¶¶24, 28, 29, 30.[5]

---

[3] *See* Section 9311(a) of the Agriculture Code, 3 Pa. C.S. §9311(a) ("The State Horse Racing Commission is established as a commission within the Department of Agriculture to independently regulate the operations of horse racing, the conduct or pari-mutuel wagering and the promotion and marketing of horse racing in this Commonwealth . . . ."); Section 9323(a) of the Agriculture Code, 3 Pa. C.S. §9323(a) ("The commission shall develop a licensing or other classification system for the regulation of racing vendors, trainers, jockeys, drivers, horse owners, backside area employees and other individuals participating in horse racing and all other persons required to be licensed as determined by the commission. The license shall not be a property right."); Section 163.51(a)(10) of the Commission's regulations, 58 Pa. Code §163.51(a)(10) ("The following are required to be licensed by the Commission before engaging in an activity related to a race meeting licensed by the Commission. The annual license fee and expiration date[] are set forth after each occupation: . . . Farrier--$15—December 31.").

[4] *See* Section 163.52(a) of the Commission's regulations, 58 Pa. Code §163.52(a) ("The issuance of a farrier's license shall be dependent upon the ability of the applicant to satisfactorily complete an examination of his capabilities. The examination . . . shall be conducted by an organization or entity appointed by the Commission. In order to complete the examination, the applicant shall attain a satisfactory score. That score shall be determined by the organization giving the examination and approved by the Commission.").

[5] *See* Section 163.56 of the Commission's regulations, 58 Pa. Code §163.56 ("The Commission may refuse to issue a license under this section, if it finds the applicant: (1) Has
**(Footnote continued on next page…)**

The Union claims that it and its members "are directly, and negatively, impacted by the nonfeasance, misfeasance, and malfeasance of the Commission . . . ." *Id.* at ¶18.[6] Specifically, the Union asserts: "individuals whose qualifications are uncertain (and unproven) are competing for jobs with the Union's well-qualified and tested members"; "horses at thoroughbred racetracks in this Commonwealth are at risk"; there is a "diminishment of qualifications and character of the labor pool of farriers"; "damage[] to the good name and reputation of the members of the Union" has resulted; and there is "a lack of appropriate safety in the work environment." *Id.* at ¶¶25, 32.

Based on the foregoing, the Union asks this Court to issue an order requiring the Commission to pay its costs and attorney fees, and to comport with the law by: (1) appointing a testing entity as required by Section 163.52 of the Commission's regulations, 58 Pa. Code §163.52; (2) requiring the testing of all new applicants for a license; (3) revoking all improperly issued licenses; (4)

---

**(continued…)**

been convicted of a crime involving moral turpitude. (2) Has engaged in bookmaking or another form of illegal gambling. (3) Has been found guilty of fraud or misrepresentation in connection with racing or breeding. (4) Has been found guilty of a violation or attempt to violate a law, rule or regulation of racing in a jurisdiction, for which suspension from racing might be imposed in the jurisdiction. (5) Has violated rules, regulations or order of the Commission. (6) Is not financially responsible.").

[6] The Union alleges that its representatives and those of the University of Pennsylvania's School of Veterinary Medicine "addressed the Commission's dereliction of its responsibilities at Commission meetings, as well as with Commission representatives *via* telephone and email," and that they "had initially been assured that the Commission will begin to follow the law," but that the Commission's Acting Bureau Director "has articulated the Commission's true position that there will be no changes in order to comport with the law." Amended Petition at ¶¶26, 27. The Union also asserts that "[c]omplaints to other agencies about the above-described matters have been referred back to the Commission, which has failed and refused to act." *Id.* at ¶31.

4

requiring the testing of all improperly licensed farriers who cannot produce verification of the successful completion of the testing; (5) enforcing a regimen for license applications and renewals to comply with Section 163.56 of the Commission's regulations, 58 Pa. Code §163.56; and (6) ensuring that racetracks and others under the Commission's authority comply with all applicable laws, including workers' compensation laws.

On March 23, 2017, the Commission filed the instant preliminary objections to the Amended Petition,[7] first alleging that the Union is not entitled to mandamus relief because it has failed to exhaust a statutory remedy. Preliminary Objections at ¶¶20-29. Specifically, the Commission asserts that the Union "had two possible administrative remedies available to it: filing of a formal complaint under 1 Pa. Code §35.9[8] or filing of a petition for declaratory order under 1 Pa. Code §35.19.[9]" *Id.* at ¶24.

_____

[7] "In reviewing preliminary objections, all material facts averred in the complaint, and all reasonable inferences that can be drawn from them, are admitted as true. However, a court need not accept as true conclusions of law, unwarranted inferences, argumentative allegations, or expressions of opinion. 'Preliminary objections should be sustained only in cases that are clear and free from doubt.'" *Seitel Data, Ltd. v. Center Township*, 92 A.3d 851, 859 (Pa. Cmwlth. 2014), *appeal dismissed*, 111 A.3d 170 (Pa. 2015) (citations omitted).

[8] Section 35.9 of the General Rules of Administrative Practice and Procedure (GRAPP) states, in relevant part:

> A person complaining of anything done or omitted to be done by a person subject to the jurisdiction of an agency, in violation of a statute or regulation administered or issued by the agency may file a complaint with the agency. . . . A copy of the complaint will be forwarded by the agency to the respondent who will be called upon to satisfy the complaint or to answer the same in writing . . . . If, in the judgment of the agency, a violation of a statute or regulation administered or issued by the agency has been alleged and has not been satisfied adequately the agency will either invite the parties to

**(Footnote continued on next page…)**

As this Court has explained:

> A party challenging administrative decision-making that has not exhausted its administrative remedies is precluded from obtaining judicial review by mandamus or otherwise. The primary purpose of the exhaustion doctrine is to ensure that claims will be heard, as a preliminary matter, by the body having expertise in the area. It further provides the agency with the opportunity to correct its own mistakes and to moot judicial controversies.

*Matesic v. Maleski*, 624 A.2d 776, 778 (Pa. Cmwlth. 1993) (citations omitted).

---

**(continued…)**

an informal conference, set the matter for a formal hearing, or take another action which in the judgment of the agency is appropriate. *See also* Section 165.171(a) of the Commission's regulations, 58 Pa. Code §165.171(a) (defining "complaint" as "[a] written statement of facts under oath submitted by a person which accuses the licensee of a violation of statute or of the rules and regulations promulgated by the Commission."); Section 165.173, 58 Pa. Code §165.173 ("Complaints, appeals, affidavits, petitions, motion and other formal papers shall be filed with the Commission at its executive offices in Harrisburg, Pennsylvania. The same shall be legible and in paragraph form and shall contain all principal allegations of fact and rules or issues of law believed to be relevant. Complaints, appeals, original petitions or similar motions shall be sworn by the applicant."); *St. Clair Area School District v. Department of Education*, 584 A.2d 384, 386 (Pa. Cmwlth. 1990) ("The [GRAPP] apply to agency proceedings unless a statute sets forth different rules on the same subject, or unless the agency itself has promulgated inconsistent rules. 1 Pa. Code §31.1. With respect to the department's action in this case, there are no statutory or procedural provisions that preempt the application of the [GRAPP].").

[9] Section 35.19 of the GRAPP states:

> Petitions for the issuance, in the discretion of an agency, of a declaratory order to terminate a controversy or remove uncertainty, shall state clearly and concisely the controversy or uncertainty which is the subject of the petition, shall cite the statutory provision or other authority involved, shall include a complete statement of the facts and grounds prompting the petition, together with a full disclosure of the interest of the petitioner.

Further:

> The courts of this Commonwealth have long held that a party challenging administrative decision-making must first exhaust administrative remedies before seeking judicial review; where such remedies exist, courts lack jurisdiction. This doctrine is not inflexible, and it is not applied where administrative remedies are not available or are not adequate. A remedy is not adequate if it does not allow for adjudication of the issue raised or if it permits irreparable harm to occur to the plaintiffs during the pursuit of the statutory remedy. In addition, exhaustion has not been required in some cases where a complaint stated a direct constitutional attack upon a statute, such that administrative proceedings would contribute little to the ultimate adjudication, or where pursuit of an existing remedy would be futile.

*Pennsylvania Pharmacists Association v. Department of Public Welfare*, 733 A.2d 666, 672 (Pa. Cmwlth. 1999) (citations omitted). Moreover, "[c]ourts should not lightly assume the futility of a party's pursuing an administrative remedy; instead, it is to be assumed that the administrative process, if given the opportunity, will discover and correct its errors." *Id.* at 673 (citations omitted).[10]

In *Coder v. State Board of Chiropractic Examiners*, 471 A.2d 563 (Pa. Cmwlth. 1984), George Coder, D.C., and the Pennsylvania Chiropractic Society (Society) filed a formal complaint with the State Board of Chiropractic Examiners (Board), pursuant to Section 35.9 of the GRAPP, to prevent the Board from continuing in effect 52 chiropractic licenses that the Board had issued to graduates of the ADIO Institute of Straight Chiropractic, Inc. (ADIO) and to enjoin

---

[10] *See also Schmidt v. Boardman Company*, 11 A.3d 924, 942 n.17 (Pa. 2011) ("The presumption in favor of exhaustion must be emphasized . . . and hence courts are very skeptical of exception claims and such claims only rarely succeed.") (quoting CHARLES H. KOCH, JR., 4 ADMIN. L. & PRAC. §12:22 (2d ed. 2010)).

7

the further issuance of such licenses to ADIO graduates.[11]  In a June 1982 special meeting, a majority of the Board had adopted a motion that gave ADIO "interim approval" for one year to allow its graduates to sit for the license examination and ordered that licenses be issued to all ADIO graduates who pass the examination during that period.  Coder and the Society filed the formal complaint against the issuance of these licenses, and the Board met in July 1982 to consider the complaint.  At that meeting, and a subsequent September 1982 meeting, a majority of the Board adopted orders which resulted in the issuance of the 52 licenses to the ADIO graduates during this period of "interim approval."

---

[11] We summarized the crux of the dispute in that case as follows:

> Throughout this case, there has echoed the intensive controversy which exists in the chiropractic profession over two disparate approaches to that healing art:  (1) the "straight" chiropractic approach, to which ADIO purports to adhere (along with other schools not in Pennsylvania), in which treatment is confined to the adjustment of spinal subluxations by hand; and (2) the remaining view, colloquially labeled the "mixer" approach, which also involves, in addition, adjunctive treatment and the use of "modalities," i.e., treatment equipment and devices.
>
> Clearly, the young people graduated from ADIO have become the victims of this dispute among their professional elders.  The board, having authorized ADIO to function as a school and thus to receive as income the tuition paid by the young students—who have also committed years of their lives to study at ADIO—has granted licensure to some of those students, and those licenses have become the subject of the intra-professional warfare.

*Coder*, 471 A.2d at 564.  *See also id.* at 568 ("The essence of the question before this court has been whether or not the court should intervene in the actions of the board, as it seeks to administer its function, under the governing statute, in the context of the intra-professional warfare described above.").

8

Coder and the Society appealed the Board's action to this Court, arguing that this Court should: (1) overturn the Board's grant of licenses to the 52 ADIO graduates because ADIO is a school of chiropractic and not a college authorized to confer degrees; (2) overturn the Board's licensure action because it was ineffective due to the Board's failure to publish and post notice of the special meeting; (3) overturn the Board's grant of interim approval of ADIO and licenses to its graduates because they were invalid adjudications under Section 507 of the Administrative Agency Law, 2 Pa. C.S. §507; and (4) declare the Board's action in granting the licenses to 52 ADIO graduates invalid based on the nature of the approval status that the Board conferred upon ADIO. *See Coder*, 471 A.2d at 568.[12] However, we ultimately rejected the merits of the claims raised on appeal and refused to order the revocation of the 52 licenses issued by the Board to the ADIO graduates. *See id.* at 569-572.

In the instant case, the Union could have filed a formal complaint with the Commission under Section 35.9 of the GRAPP based on the Acting Bureau Director's "articulation" that "there will be no changes in order to comport with the law" with respect to the purportedly improperly issued and renewed farrier licenses after the Union had been assured by the Commission that it would, in fact, follow the law in this regard. Amended Petition at ¶¶26, 27.[13] *See* 1 Pa. Code §35.9 ("A

---

[12] Coder and the Society also initiated an action in our original jurisdiction; however, we noted that "[a]lthough the litigation has proceeded without objection from either side, in part as an original jurisdiction proceeding in the nature of equity, the issues presented . . . essentially call upon this court to review actions of the [board], taken pursuant to that board's extended, but nevertheless complete, administrative process." *Coder*, 471 A.2d at 568. As a result, that action was ultimately dismissed. *See id.* at 572.

[13] There is no indication who made the alleged complaints to other agencies that were referred back to the Commission and not acted upon or whether they preceded or followed the **(Footnote continued on next page…)**

9

person complaining of anything done or omitted to be done by a person subject to the jurisdiction of an agency, in violation of a statute or regulation administered or issued by the agency may file a complaint with the agency."). Such a course would have given the Commission the opportunity to correct its own purported mistakes with respect to the issuance and renewal of these licenses and moot the instant judicial controversy, *Matesic*, and the Commission's disposition of the formal complaint will be reviewed by this Court on appeal. *Coder*.[14, 15] Moreover,

---

**(continued…)**

Commission's assurance that the law would be followed. Amended Petition at ¶31. Nevertheless, any such complaints should have been filed with the Commission itself under Section 35.9 of the GRAPP as in *Coder*.

[14] *See also* Section 165.185 of the Commission's regulations, 58 Pa. Code §165.185 ("Within 30 days after the entry of an adjudication or another final order or decision of the Commission, a party shall have the right to appeal therefrom to the Commonwealth Court under 42 Pa. C.S. §763 (relating to direct appeals from government agencies.). Parties interested jointly, severally or otherwise in the same adjudication may join in an appeal therefrom even though the interested parties do not join therein.").

[15] In its preliminary objections, the Commission also asserts that the Union's claims with respect to Section 163.52(a) of the Commission's regulations are now moot as a result of the Commission's July 27, 2016 order at Admin. Docket: 2016-3 which states, in relevant part:

> [I]t is hereby ORDERED and DIRECTED that the [Commission] shall conform all policies and procedures in operation at the three Thoroughbred racetracks in the Commonwealth to the text of 58 Pa. Code §163.52 and any and all written procedures to the contrary . . . are hereby superseded. Specifically, the following shall be adhered to by all [Commission] employees:
>
> (a) The issuance of a farrier's license shall be dependent upon the ability of the applicant to satisfactorily complete an examination of his capabilities.
>
> (b) The examination of the applicant shall be conducted by an organization or entity appointed by the Commission. **The**

**(Footnote continued on next page…)**

10

there is no indication that the Commission could not adjudicate the issues or that following such a procedure would cause irreparable harm, and it must be assumed

---

**(continued…)**

> **University of Pennsylvania, School of Veterinary Medicine, New Bolton Center, is so appointed.**
>
> (c)  In order to complete the examination, the applicant shall attain a satisfactory score.
> (d)  That score shall be determined by the organization giving the examination and approved by the Commission.
>
> (e)  Persons holding a farrier's license in this Commonwealth on March 27, 1982, are exempt from the examination requirements of subsection (a).
>
> (f)  If a license is terminated by action of the Commission or by failure to renew, the examination shall be required for reissuance, unless excused by action of the Commission.
>
> (g)  If an applicant fails to satisfactorily complete the farrier's examination, the applicant may apply for retesting no earlier than 14 days after the initial failure and no earlier than 90 days after each subsequent failure.

Preliminary Objections at Exhibit A (emphasis in original).  However, as noted by the Union, the consideration of the Commission's July 27, 2016 order is not appropriate on preliminary objection, but may be considered as new matter in a responsive pleading.  *See, e.g., Cardella v. Public School Employees' Retirement Board*, 827 A.2d 1277, 1282 (Pa. Cmwlth. 2003) (holding that the Public School Employees' Retirement Board could not take official notice of the Public School Employees' Retirement System's (System) files and use information from the files to sustain the System's preliminary objections in the nature of a demurrer and dismiss an employee's request to elect specific class membership in the System); *Martin v. Department of Transportation*, 556 A.2d 969, 971-72 (Pa. Cmwlth. 1989) (holding that a court of common pleas erred in considering an affidavit attached to preliminary objections in the nature of a demurrer regarding county ownership of a road and ditch and could not take judicial notice as to ownership).

11

that the Commission, if given the opportunity, will discover and correct its errors. *Pennsylvania Pharmacists Association*.

Similarly, in *Pennsylvania Pharmacists Association*, the Pennsylvania Pharmacists Association (Association) and seven individual pharmacies filed a petition for review in our original jurisdiction against the Department of Public Welfare (Department) seeking declaratory, equitable, and mandamus relief. The petition alleged that the pharmacies participated in the Medical Assistance (MA) Program under Title XIX, Sections 1901-1935, of the Social Security Act (Title XIX), 42 U.S.C. §§1396-1396v, under standard agreements with the Department. The petition sought a declaration that the outpatient pharmacy rates under a managed-care program[16] were implemented in violation of the law and the standard agreements; requested an order enjoining the Department from permitting continued reimbursements to providers under the managed-care program using the then-current outpatient pharmacy rates and directing the Department to require reimbursement at a prior rate; and asked for mandamus relief in the form of an order directing the Department to implement the managed-care program rates in conformity with federal and state law and an award of damages equal to that which would have been paid under the prior rates.

---

[16] Under the managed-care program, recipients were required to receive medical services, including pharmaceutical services, from one of four designated health maintenance organizations (HMOs) with which the Department had contracted. The HMOs contracted with pharmacy benefit managers to administer the outpatient pharmacy services and they, in turn, contracted with the individual pharmacies. *Pennsylvania Pharmacists Association*, 733 A.2d at 668-69. As we explained, "[t]he gravamen of Petitioners' complaint is that the pharmacy benefits managers, without oversight from [the Department], systematically decreased the outpatient pharmacy benefit rates to unreasonably low levels and that [the Department's] method of implementing the [managed-care] program to permit this result violated state and federal statutes and regulations, the [standard a]greements and the [managed-care program] waiver." *Id.* at 669.

The Department filed preliminary objections alleging, *inter alia*, that the Association and the pharmacies had failed to exhaust the administrative remedy of Section 35.19 of the GRAPP under which they could petition the Department's Secretary to review the outpatient rates being offered to pharmacies under the managed-care program and to recalculate them to conform to Title XIX and the federal regulations. *Pennsylvania Pharmacists Association*, 733 A.2d at 671-72. In fact, the Department noted, the Association and the pharmacies had, in effect, pursued this remedy via a letter to the Secretary formally requesting review of the current outpatient rates. *Id.*

In sustaining this preliminary objection and dismissing the petition for review, we explained:

> Petitioners have advanced no compelling reason why [the Department's] consideration of their claims through any of these procedures is not potentially sufficient to secure the relief that they seek. . . . Although the position that [the Department] has taken in the present litigation is contrary to that of Petitioners, the Court expects that the Secretary will conduct a fair and impartial review of the issues Petitioners have raised. In addition, because the issue here involves the technical question of the interpretation and application of Title XIX, the Court concludes that initial consideration by the entity with expertise in implementing the [MA] Program is appropriate.

*Id.* at 672-73.

Likewise, the Union could have filed a formal petition for a declaratory order with the Commission under Section 35.19 of the GRAPP based on the Commission's purported failure to follow statutory and regulatory law in issuing and renewing the farrier licenses. *Pennsylvania Pharmacists Association*. Such a course would have given the Commission, the entity with the expertise in

13

implementing the Agriculture Code with respect to thoroughbred horseracing, the initial opportunity to consider its purported misinterpretation and misapplication of the Agriculture Code and its own regulations, and any error with respect to the Commission's disposition of the formal petition will be reviewed by this Court on appeal. *Id.*; 58 Pa. Code §165.185. Again, there is no indication that the Commission could not adjudicate the issues or that following such a procedure would cause irreparable harm, and it must be assumed that the Commission, if given the opportunity, will discover and correct its errors. *Pennsylvania Pharmacists Association.*[17]

---

[17] Finally, there is yet another administrative remedy that George Geist and the other Union members may avail themselves to contest the issuance or renewal of the farrier licenses. Section 35.23 of the GRAPP states that "[a] person objecting to the approval of an application . . . which is, or will be, under consideration by an agency may file a protest." 1 Pa. Code §35.23. However, Section 35.23 provides that "[t]he filing of a protest does not make the protestant a party to the proceeding; a separate petition to intervene is required for this purpose." Nevertheless, Section 35.28(a)(2) states that "[a] petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following: . . . An interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding. The following may have an interest: . . . [C]ompetitors of the applicant or respondent." 1 Pa. Code §35.28(a)(2). *See also Jochen v. Horn*, 727 A.2d 645, 648 (Pa. Cmwlth. 1999) ("Moreover, in carrying out its enforcement duties under the Act [of April 27, 1927, P.L. 465, *as amended*, 35 P.S. §§ 1221–1235.1 (commonly referred to as the Fire and Panic Act (Act))], [the Department of Labor and Industry (L&I)] has subjected all of its enforcement proceedings . . . to the [GRAPP]. Under these general rules, Petitioners have available to them several other administrative procedures. For example, Petitioners could file the following with [L&I's Industrial] Board: an informal complaint, 1 Pa. Code §35.5; a formal complaint, 1 Pa. Code §35.9; a protest in an action already under consideration regarding Act violations, 1 Pa. Code §35.23; or a petition to intervene in a pending action, 1 Pa. Code §35.30.").

Accordingly, the Commission's preliminary objection is sustained and the Union's Amended Petition is dismissed.[18]

_____
MICHAEL H. WOJCIK, Judge

---

[18] Based on our disposition of the Commission's first preliminary objection, we will not reach the remaining preliminary objections.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

International Chapter of Horseshoers : <br>
and Equine Trades, Local 947, :

:

              Petitioner  :

:

           v.        :  No. 338 M.D. 2016

:

Pennsylvania State Horse Racing : <br>
Commission (Pennsylvania : <br>
Department of Agriculture), :

:

          Respondent :

# **O R D E R**

AND NOW, this 3rd day of October, 2017, the Preliminary Objection of the Pennsylvania State Horse Racing Commission (Pennsylvania Department of Agriculture) is SUSTAINED and the Amended Petition for Review in Mandamus filed by the International Chapter of Horseshoers and Equine Trades, Local 947 is DISMISSED.

_____ <br>
MICHAEL H. WOJCIK, Judge